# Exhibit A

UNITED STATES BANKRUPTCY COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

------------------------------------------------------------

DEMETRIUS BERTRAND DICKERSON, SR, ) No. 12-11284

　　　　　　　　　Debtor.　　　　　)

------------------------------------------------------------

30(b)(6) Deposition Upon Oral Examination of

MERCHANTS CREDIT CORPORATION

DESIGNEE:  SCOTT WISWALL

------------------------------------------------------------

150 Nickerson Street

Suite 311

Seattle, Washington

DATE:  August 28, 2018

REPORTED BY:  Christina Atencio, CCR #2749

```
                                              Page 2
 1   APPEARANCES:

 2

 3   For the Plaintiff:    CHRISTINA L. HENRY, ESQ.

 4                         Henry & DeGraaff

 5                         150 Nickerson Street

 6                         Suite 311

 7                         Seattle, WA  98109

 8                         (206) 330-0595

 9                         chenry@hdm-legal.com

10

11   For the Defendant:    JAMES E. DICKMEYER, ESQ.

12                         Attorney at Law

13                         P.O. Box 908

14                         Kirkland, WA  98083

15                         (425) 889-2324

16                         jim@jdlaw.net

17

18

19

20

21

22

23

24

25
```

Page 3

```
 1                      E X H I B I T S
 2    NO.    DESCRIPTION                                  PAGES
 3    1      Subpoena                                     13
 4    2      Summons and Complaint, Case No. 93-17172     14
 5    3      Motion, Affidavit and Order for Default      14
             Judgment
 6
       4     Writ of Garnishment for Continuing Lien      18
 7           on Earnings
 8    5      Writ of Garnishment for Continuing Lien      18
             on Earnings
 9
       6     Note History Printout                        21
10
       7     Writ of Garnishment for Continuing Lien      29
11           on Earnings
12    8      Writ of Garnishment for Continuing Lien      29
             on Earnings
13
       9     Discharge of Debtor                          33
14
      10     King County Marriage Records                 35
15
      11     Release of Writ of Garnishment               36
16
      12     Release of Writ of Garnishment               36
17
      13     1) Document No. 306, Final Bankruptcy Notice  43
18           2) Document No. 105, Printing Screens
                for Bankruptcy
19           3) Document No. 401, Trial Desk Bankruptcy
             4) Document No. 909, Logging in Bankruptcy
20              Money
             5) Document No. 905, Printing Screens for
21              Bankruptcy
22    14     Policy and Procedure regarding Garnishment   47
             and Bankruptcy
23
      15     Application for Writ of Garnishment          53
24
      16     King County District Court Docket regarding  54
25           93-017172-CVKCD
```

Page 4

1                E X H I B I T S (Continued)

2    NO.      DESCRIPTION                                    PAGES

3    17       Audio recordings                               62
              1) 001U334ET581BC348 10 101 17 19
4             2) 0199 20180430
              3) 0299 20180430
5             4) 0299 20180501
              5) 0499 20180501
6             6) 0599 20180501
              7) 0699 20180502
7             8) 0799 20180503
              9) 0899 20180508
8             10) 0999 20180508
              11) 1099 20180510
9             12) 1199 20180514
              13) 1299 20180515
10            14) 1399 20180516
              15) 1499 20180516
11            16) 1599 20180518
              17) 1699 20180521
12
     17-A     Transcript of Audio Recording 0199 20180430    96
13
     17-B     Transcript of Audio Recording 0799 20180503    96
14
     17-C     Transcript of Audio Recording 1099 20180510    96
15
     18       Letter from Law Office of Andrew Gebelt,       65
16            8/1/12
17   19       Fax Cover Sheet, 5/4/18 with attachments       79
18   20       Letter from Henry & DeGraaf, 6/8/18            79
19
                    E X A M I N A T I O N
20
     BY                                                      PAGES
21
     Ms. Henry.............................................5
22
     Mr. Dickmeyer........................................95
23

24

25

Page 5

1          Seattle, Washington; Tuesday, August 28, 2018

2                          10:14 a.m.

3                  --------------------

4    SCOTT WISWALL,              called as a witness in the

5                               above-entitled cause, being

6                               first duly sworn, testified

7                               as follows:

8

9                          EXAMINATION

10   BY MS. HENRY:

11       Q.  Okay.  What is your name for the record?

12       A.  Scott Wiswall.

13       Q.  Do you understand that you're under oath and that

14   there's a court reporter here, and do you understand that

15   the reporter will make a transcript that they can use in a

16   trial or other proceedings in this case?

17       A.  Yes.

18       Q.  I will ask you some questions today and I want you

19   to make sure you understand the question.  So if you don't

20   understand and need me to rephrase or clarify, let me know.

21   All right?

22       A.  Yes.

23       Q.  Are you on any medications or substances that would

24   interfere with your ability to testify today?

25       A.  No.

Page 6

1      Q.  Do you understand that you are testifying on behalf
2  of Merchants Credit today?
3      A.  Yes.
4      Q.  And because you're testifying on behalf of
5  Merchants, when I say "you," I'll be referring to Merchants.
6  Is that okay?
7      A.  Yes.
8      Q.  There's one exception.  In the beginning I'm going
9  to be asking you some information about your personal life
10 and your personal background in terms of your job.  Is that
11 okay?
12     A.  Yes.
13     Q.  What is your job title?
14     A.  I'm the collection manager of Merchants Credits.
15     Q.  And what are the responsibilities for your job?
16     A.  I have been there for 28 years, and so I do a little
17 bit of everything at Merchants Credit.  I manage
18 specifically our collection floor at Merchants Credit and am
19 in charge of hiring, firing, and production, collection
20 production.
21     Q.  When you say "collection production," what does that
22 mean?
23     A.  Collecting money for Merchants Credit.  We're a
24 collection agency.
25     Q.  And do you have employees under you?

Page 7

1      A.   Yes.

2      Q.   How many employees do you have?

3      A.   We have 70 -- approximately 70 employees at

4   Merchants Credit; and 67 of those employees would be under

5   me.

6      Q.   Okay.  And the others are in what group?

7      A.   I'd like to explain.

8      Q.   Sure.

9      A.   I'm the collections manager at Merchants Credit and

10   I also own 10 percent of the company.

11      Q.   So you're also an owner?

12      A.   That is correct.  So theoretically every employee,

13   other than the two other owners, would be under me.

14      Q.   And who are the two other owners?

15      A.   Dave Quigley and Carol Taylor.

16      Q.   Okay.  The 67 people, as far as your job function,

17   they report to you?

18      A.   I would say so, yes.

19      Q.   Roughly you said -- so there's just three other

20   people that are the owners that don't report to you?

21      A.   Two other.

22      Q.   Two other people, okay.  And are there other

23   managers or supervisors below you?

24      A.   Yes.

25      Q.   And how many of those?

Page 8

```
 1      A.   Can I give you an approximate number?

 2      Q.   Yes.

 3      A.   Between 10 and 15.

 4      Q.   10 and 15?

 5      A.   Yes.

 6      Q.   How do their functions -- or what functions are they

 7   responsible for?

 8      A.   We have five collection supervisors -- I believe --

 9   five collection supervisors.  We have a compliance manager

10   who is also in charge of our IT department.  We have a

11   customer service manager.  We have a legal manager.  We have

12   corporate counsel.  We have our office manager or

13   accounting; she's our accountant.  And then we have our

14   accounting supervisor.

15      Q.   Okay.

16      A.   However many that is.  I may have missed one or two.

17      Q.   For your legal manager, who is that person?

18      A.   Jennifer Hathaway.

19      Q.   And does Jennifer Hathaway have employees under her?

20      A.   Yes, she does.

21      Q.   And how many employees?

22      A.   I believe it's five or six.

23      Q.   Are any of those employees lawyers?

24      A.   No.

25      Q.   And so what is their function in legal?
```

1       A.   They process legal documents, summons and

2   complaints.   They oversee the legal production in our

3   office.

4       Q.   And then you said there's an attorney?

5       A.   Yes.

6       Q.   And who is that attorney?

7       A.   Jason Woehler.

8       Q.   And is there anyone else that supports him?

9       A.   What do you mean by that specifically?

10      Q.   When you said there's a legal department and you

11  said that that is a department separate from Jason, so is

12  Jason under himself as a manager with any employees

13  underneath him?

14      A.   I would say that he manages our legal department to

15  some degree and he also interacts with our compliance

16  department to some degree.   And he's supported by customer

17  service representatives, meaning they answer telephones and

18  things of that nature.

19      Q.   Are there any other attorneys?

20      A.   Who are employees of Merchants Credit?

21      Q.   Yes.

22      A.   No.

23      Q.   And have you given a deposition before on behalf of

24  Merchants Credit?

25      A.   Yes.

1      Q.   About how many times have you given a deposition?

2      A.   I believe four but I'm not certain.  I have done two

3   in person and two or three by telephone.

4      Q.   Okay.  So in your capacity do you have any direct

5   activities that regard lawsuits against customers?

6      A.   Yes.

7      Q.   Okay.  Tell me what that entails.

8      A.   Typically our bill collectors, if they feel they

9   need to move an account to legal, they have a criteria that

10  they would have to follow.  If the lawsuit does not meet the

11  specific criteria, I would need to approve that lawsuit;

12  would be one thing.

13        Could you repeat the question to make sure I'm

14  giving you the right information?

15        (Reporter read back as requested.)

16     A.   I would handle phone calls on occasion when the

17  customers call in.  For example, if they were served a

18  summons and complaint, I might handle that telephone call.

19  I would interact with our clients if they had a question

20  about a lawsuit.  I may handle general questions from our

21  legal department if they had a concern.  I would handle any

22  number of things that would involve the legal process.

23     Q.   Are you a lawyer?

24     A.   No, I'm not.

25     Q.   So have you ever testified in trial for Merchants?

1      A.  Yes, I have.

2      Q.  And how many trials have you testified in?

3      A.  Are you talking about trials where the plaintiff --

4  we're suing somebody -- or are you talking about trials

5  where we're being sued?

6      Q.  Why don't you tell me an approximation of both

7  circumstances.

8      A.  One time when we were sued -- and I don't know how

9  many -- when we had filed a suit against the consumer.  I

10 stopped doing that about 10 years ago.  But I used to be the

11 designated witness for Merchants at trial or hearings or

12 what have you in district court.

13     Q.  So in ten years you did it quite often?

14     A.  Yes.

15     Q.  So the one where you were being sued, how long ago

16 was that -- or where Merchants was being sued?

17     A.  I believe it was about five years ago, give or take.

18     Q.  And did that issue involve bankruptcy?

19     A.  No, it didn't.  I don't believe it did.

20     Q.  But it was a consumer lawsuit against Merchants?

21     A.  Yes, in federal court.

22     Q.  Okay.  Have you ever provided declarations or

23 witness statements on behalf of Merchants in any lawsuit?

24     A.  Yes, I have.

25     Q.  For lawsuits, where a consumer has sued Merchants?

Page 12

1       A.   I believe I have.

2       Q.   Do you know the approximate number?

3       A.   No.

4       Q.   In what circumstance would you be signing on behalf

5  of Merchants for declaration?

6       A.   If we were asked to compile the information because

7  we were sued, I might be the person to sign off on the

8  information before it's sent out to opposing counsel, I

9  believe.

10      Q.   Okay.  And prior to working at Merchants, what was

11  your employment?

12      A.   I worked at Seafirst Bank.

13      Q.   Okay.  That was a while ago.  Do you remember --

14  when Seafirst was still around?

15      A.   Well, actually I worked at Bank of America because I

16  worked at Seafirst and Bank of America took over Seafirst,

17  and I worked with them for a little bit.

18      Q.   What did you do there?  What was your function?

19      A.   I was a collector, a financial specialist, I guess

20  was the title.  But I called people and asked them to pay on

21  mortgages.  And at the end I was collecting on defaulted

22  commercial loans for the bank.

23      Q.   How long did you work there?

24      A.   Five years.

25      Q.   Can you tell me about your education?

Page 13

1       A.   I have a finance degree from Oregon State.

2       Q.   A BA degree?

3       A.   Yes.

4            (Exhibit 1 marked.)

5       Q.   You're looking at Exhibit 1, which is the subpoena

6   that was issued for your testimony today.  Does this

7   document look familiar to you?

8       A.   Yes.

9       Q.   Were you served with this document and had you

10  reviewed it before today's testimony?

11      A.   By "you," do you mean our company?  Have we moved

12  into that phase now?

13      Q.   Yeah.  When I use the term "you," I'm referring to

14  Merchants Credit.

15      A.   Yes, we were.

16      Q.   Okay.

17           MR. DICKMEYER:  And just for the record, page 2 of

18  Exhibit 1 refers to Mr. Woehler's agreement to accept

19  service.

20           MS. HENRY:  Um-hmm.  Yes.

21      Q.   So have you had a chance to look at the topics on

22  Schedule A to the Exhibit A attachment to the subpoena?

23      A.   Yes, I have.

24      Q.   And have you reviewed those topics in preparation

25  for today's testimony?

Page 14

1        A.   Yes, I have.

2             (Exhibits 2 and 3 marked.)

3        Q.   You have in front of you Exhibit Number 2 and

4   Exhibit Number 3.  I'm going to have you look at Exhibit

5   Number 2 first.  Have you seen this document before and can

6   you tell me what it is?

7        A.   It's a summons and complaint and, yes, I've seen it

8   before.

9        Q.   Okay.  And is it the lawsuit that pertains to the

10  debt in this case that we're discussing this morning?

11       A.   I believe so.

12       Q.   And can you tell me who is Merchants Credit suing

13  and what are they suing for?

14       A.   Merchants Credit is suing Shirley Dickerson aka

15  Bowen and John Doe Dickerson, her husband.

16       Q.   Okay.  And when was this lawsuit filed?

17       A.   The lawsuit is dated on November the 4th of '09

18  according to page 2.

19       Q.   And it's for which debt?

20       A.   It appeared on the stamp -- let me correct that --

21  the stamp on page 1 indicates that it was filed in King

22  County District Court on November the 6th of 2009.  And the

23  debts were for Valley Medical Center for the last charge

24  dates on June the 10th of '06 and 12/24 of '08, according to

25  the complaint, page 2.

1     Q.  Okay.  And then I'm going to have you look at

2   Exhibit 3.  And are you familiar with this document and can

3   you explain what this document is for the record?

4     A.  Yes.  I believe that I am familiar with it.  It's a

5   Motion Affidavit and Order for Default Judgment and case

6   93-17172.

7     Q.  And it's a lawsuit against who?

8     A.  Shirley Dickerson aka Bowen and John Doe Dickerson.

9     Q.  And it's brought by which plaintiff?

10    A.  Merchants Credit Corporation.

11    Q.  Are you familiar with the debts that are being

12  requested in this document?

13    A.  Yes, I believe I am.

14    Q.  Okay.  And can I point you to the actual judgment, I

15  believe that's on page 3 of the document.  What date was

16  that order and judgment entered?

17    A.  It appears to be January the 11th, 2010.

18    Q.  Can you tell me for what dates of service with

19  Valley Medical that this judgment was entered for?

20    A.  Can you point me to the page?

21    Q.  It's not numbered, so I believe it's page 4.  You're

22  looking right at it.

23    A.  I'm not certain if these are the dates of service or

24  not.

25    Q.  Okay.  Maybe you can tell me what dates are listed

Page 16

1    here and what these dates represent?

2       A.  I show interest start date on 10/19 of '06; interest

3    and date 11/4 of '09; interest start date of April 28th of

4    '09; interest and date of 11/4 of '09.

5       Q.  Okay.  And there's one amount for the October 2006

6    date.  There's another date for the April 2009 date.

7       A.  Yes.

8       Q.  And so they tie into which dates of service for

9    medical services?

10      A.  Is it on this document or could I refer to a

11   different document?

12      Q.  You can refer to the entire document to answer these

13   questions if that helps you.

14      A.  It was on Exhibit 2.  Can I look at that?

15      Q.  You can look at either exhibit.

16      A.  Thank you.  Exhibit 2 shows that the last charge

17   dates were 6/10 of '06 and 12/24 of '08.

18      Q.  Why don't I have you look at Exhibit 3 thoroughly

19   first, too, and see if that's a judgment order on both of

20   those.

21      A.  Could you clarify the question, please?

22      Q.  Why don't you take a look at the entire exhibit for

23   Exhibit 3 and verify whether that is a judgment order for

24   both of those dates that you just mentioned from Exhibit 2,

25   which was the complaint?

1      A.  (Witness reviews document.)  I believe it is.

2      Q.  Okay.  And who incurred the debt for the medical

3  services?

4      A.  I believe it was Shirley Dickerson.

5      Q.  For both the service in '06 and for the service in

6  '08?

7      A.  Let me clarify.  I believe Shirley Dickerson on the

8  '06; I'm not sure on the '08.

9      Q.  Can I have you look at Exhibit 3 a little more

10  closely?

11      A.  Can you point me to the page?

12      Q.  There's only six or seven pages, so I can wait.

13          MR. DICKMEYER:  You're referring to the '08 charge?

14          MR. HENRY:  I just want him to be familiar with the

15  document.

16          MR. DICKMEYER:  I believe that's page 4 of Exhibit

17  3.

18          MS. HENRY:  Can we stop and go off the record for a

19  second?

20          (Discussion off the record.)

21          (Reporter read back as requested.)

22      A.  It appears Shirley Dickerson was the patient on both

23  dates of service.

24      Q.  Okay.  And for the December 2008 service, the

25  balance was $3,614.77 when it was assigned to Merchants; is

Page 18

1    that correct?

2        A.   Yes.

3        Q.   And for the '06 service, the balance was $1,494.49

4    when it was assigned to Merchants?

5        A.   Yes.

6        Q.   Okay.  And there were no independent debts to Mr.

7    Dickerson, her husband, correct?

8        A.   Not that I'm aware of.

9        Q.   But he was included as a defendant on the judgment,

10   correct?

11       A.   No, I don't believe that's correct.

12       Q.   Well, explain to me why that's not the case?

13       A.   The documents indicate that the default was entered

14   against Shirley Dickerson aka Bowen and John Doe Dickerson.

15       Q.   Her husband, correct?

16       A.   That's what it says.

17       Q.   Yes, that's all I'm asking.  So it was entered

18   against her husband, correct?

19       A.   I would like to explain if I could.

20       Q.   Well, it's a yes or no answer.  It was entered

21   against her husband, correct?  That's what it says, correct?

22       A.   It says it was entered against John Doe Dickerson,

23   her husband, yes.

24       Q.   Thank you.

25            (Exhibits 4 and 5 marked.)

1      Q.   Also, one more question.  For that lawsuit that we

2    just looked at, Exhibits 2 and 3, you had mentioned before

3    that there were attorneys that worked at Merchants Credit.

4    Did the in-house attorneys, were they the attorneys on the

5    lawsuit?

6      A.   I believe Robert Friedman was our attorney at that

7    point in time, and I don't believe he was considered

8    in-house.

9      Q.   Did he work for Merchants?

10     A.   Yes, he did.

11     Q.   But he wasn't an employee of Merchants?

12     A.   I don't know how that worked at that time.

13     Q.   Well, it says on the document, "Law offices of

14   Robert S. Friedman."  So was that a separate entity from

15   Merchants Credit or was it not?

16     A.   The Law Offices of Robert Friedman?

17     Q.   Um-hmm.

18     A.   Yes.  But, again, I don't know how it worked at that

19   point in time.  He was our attorney and represented us in

20   these cases.

21     Q.   Did he have his office on the premises where

22   Merchants Credit is?

23     A.   He would come to our office and he had a work space

24   at our office where he would sit.  He also had separate

25   offices in Kirkland.

1    Q.  But nonetheless, he was the attorney at that time on

2    these pleadings?

3    A.  Yes.

4    Q.  So we're now looking at Exhibit 4 and Exhibit 5.

5    Have you reviewed these documents in preparation for today's

6    testimony?

7    A.  I believe I have, yes.

8    Q.  So looking at Exhibit 4, can you tell me what this

9    document is?

10   A.  That is a writ of garnishment for a continuing lien

11   on earnings.

12   Q.  And this was against the Dickersons, correct?

13   A.  It was Shirley Dickerson, I do believe.

14   Q.  Why do you say that it was Shirley Dickerson?

15   A.  Because it was sent to Pacific Medical Center as the

16   garnishee and it had Shirley Dickerson's name on it.

17   Q.  But you do recognize that the caption says that it's

18   the name of Dickerson, Bowen, Shirley Dickerson, John Doe

19   her husband; is that right?

20   A.  Yes, I recognize that.

21   Q.  So it would be correct to say that this is using the

22   same judgment that was entered in Exhibit 3 to garnish upon,

23   correct?

24   A.  Yes.

25   Q.  And this was -- on what date was this garnishment

Page 21

1    done?

2        A.  It was filed on February the 26th of 2010 according

3    to the stamp.

4        Q.  Okay.  And was moneys obtained?

5        A.  I believe so.

6        Q.  Okay.  I'm going to have you look at Exhibit 5.

7    This was also another writ of garnishment collecting on the

8    judgment against the Dickersons, Shirley and her husband,

9    correct?

10       A.  Yes.

11       Q.  And it was, again, based on the judgment that was

12   entered in Exhibit 3, correct?

13       A.  I believe so, yes.

14       Q.  And was money obtained from this garnishment to

15   account against the judgment owed to Merchants Credit?

16       A.  I'm not certain.

17       Q.  Have you reviewed it in preparation for today's

18   testimony?

19       A.  Yes.

20       Q.  Do you need to look at something else to be certain?

21       A.  I believe there's a copy of some notes that were

22   provided -- or collection notes -- and that would make it

23   easier for me.

24       Q.  We can look at those now if that helps.

25           (Exhibit 6 marked.)

 1      Q.  I'll note that I'm handing you Exhibit 6, which is a

 2   document that was provided by your attorney.  Are you

 3   familiar with this document?

 4      A.  Yes.

 5      Q.  I will just note for the record that I have added

 6   page numbers to the document for ease of today's deposition.

 7          MS. HENRY:  Do you have any objection?

 8      A.  Can you say that one more time?

 9      Q.  I've added page numbers to the document for ease of

10   the deposition today.

11          MR. DICKMEYER:  No objection.

12          MS. HENRY:  You have no objection.

13      Q.  Is this a document from Merchants Credit?

14      A.  Yes.

15      Q.  And this document reflects what information?

16      A.  This document reflects our note history.

17      Q.  And you have personal knowledge of how this document

18   was generated?

19      A.  Yes.

20      Q.  And what system was it created in?

21      A.  Pamar, P-A-M-A-R.

22      Q.  Is that an internal program or is that a program

23   that you can buy, any company could buy?

24      A.  You can -- I'm not sure if any company can buy it

25   anymore.  I'm not sure if they're still in business.  It was

Page 23

1    a program that we purchased a long time go and now we

2    maintain it on our own without much assistance from Pamar.

3         Q.  The collection notes here for Exhibit 6, these

4    reflect notes taken on collection of debts for Shirley

5    Dickerson, correct?

6         A.  Yes.

7         Q.  Now, go ahead and let me know where you want to take

8    me to answer the question about when the garnishments were

9    applied to her account?

10        A.  On page 5, if you look about halfway down it says,

11   "Payment dispersement."  And if you look at Number 2 and

12   Number 3, you'll see that those show payments received of

13   $296.16 and $1,565.77.  And those payments were applied to

14   reference Number L795813, which is our internal number for

15   this judgment that we've been talking about.

16        Q.  And it would be for the whole judgment; just for

17   both the 2006 and the 2008 debt, correct?

18        A.  Correct.  I would like to clarify that answer, if I

19   could.  At some point in time I do believe part of that debt

20   was released and I'd have to look at these notes to clarify

21   exactly when that was.

22        Q.  In 2010?

23        A.  I can't remember without looking at the notes.

24        Q.  Fair enough.  But from what you can see here, the

25   2010 debt was applied to the judgments.  And then how are

Page 24

1    they applied?  Because we see the amount of $296.16 and

2    $1,043.44.  Do they separate with the accounts or how do

3    they get applied to the two accounts?

4        A.  The $296.16 was applied just to legal fees and court

5    costs; and the $1,565, $1,043 of that was applied to court

6    costs and legal fees; and $522.33 was applied to account

7    Number A0826726, which is one of the accounts in the

8    judgment.

9        Q.  How do you know that?

10       A.  Because the account number is here on the document.

11       Q.  So looking at the Account Number L795813, that tells

12   you it goes to legal fees and costs?

13       A.  Yes.

14       Q.  Because of an "L"?

15       A.  Yes.

16       Q.  Okay.  And then that judgment number refers to the

17   judgment here for the Dickersons?

18       A.  Yes.

19       Q.  And where -- how can I relate that back to the

20   judgment number for the Dickersons?

21       A.  If you go to page 7 and you go down about a quarter

22   of the way, it will say, "Legal overview," sequence one

23   legal 795813; LJD; filed 11/6 of '09; and then it gives the

24   case number for district court.

25       Q.  Okay.  And does it tell you how much the attorney's

Page 25

1    fees are and where they're accruing?

2        A.   Not on this page.

3        Q.   Do you know where I can find the amount of

4    attorney's fees?

5        A.   I don't know.

6        Q.   If you look at Exhibit 3 for the order, it says that

7    statutory attorney's fees of $200 are attached to the

8    account, correct?

9        A.   Back to Exhibit 3?

10       Q.   Yes.

11       A.   What page?

12       Q.   Three, the order and judgment?

13            MR. DICKMEYER:   The very first page.

14       Q.   It does say that statutory fees are only $200,

15   correct?

16       A.   Yes.

17       Q.   And it says that there's $73 for the filing fee and

18   $47.80 is the processing fee, correct?

19       A.   Yes.

20       Q.   So $1,043.44 and then another $296.  That's over

21   $1,300, correct?

22       A.   I believe so.

23       Q.   And those are all for attorney's fees?

24       A.   Can you repeat the question again?

25       Q.   The court order allowed only $200 for statutory

Page 26

1    attorney's fees, correct?

2        A.  Correct.

3        Q.  So how is it that on page 5 of the collection notes

4    you're saying over $1,300 are applied to attorney's fees?

5        A.  Can you repeat my answer because I'm not certain if

6    that's what I said?

7            (Reporter read back as requested.)

8        Q.  So we're back on the record now and we're looking at

9    page 5 on the payments midway down the page; payment 2 and

10   payment 3, one in the amount of $296.16; the other in the

11   amount of $1,565.77.  And you want to clarify your testimony

12   as to which parts were for attorneys' fees and costs and

13   which parts actually went onto the principal judgment?

14       A.  Yes.  $1,043.44 was applied to what we refer to

15   internally at Merchants Credit as legal fees or legal costs;

16   and $522.33 was applied towards the principal on account

17   A0826726.

18       Q.  And the $296.16?

19       A.  The $296.16 was applied to what we refer to

20   internally at Merchants Credit as legal fees or legal costs.

21       Q.  So where in your account notes can I find a running

22   total of legal costs or legal fees?

23       A.  I believe that it's on page 1 of Exhibit 6.  And if

24   you go halfway down, there is LC on the left hand margin.

25       Q.  Um-hmm.

Page 27

1        A.   And those refer to legal costs.

2        Q.   Okay.  So I'm looking at that column on page 1 that

3    says "LC."  The first part says, $3,391.35; and the next

4    line says $1,339.60.  And then it says a balance of

5    $2,051.75.  Can you walk us through those numbers?

6        A.   I don't think I can without -- I don't know if I

7    can.  I can look at this document and see if I can find it

8    in here.  (Witness reviews documents.)

9             MS. HENRY:  We can take a minute for him to look.

10            (Discussion off the record.)

11            (Reporter read back as requested.)

12       A.   I don't believe I can based on the document that I

13   have in front of me.

14       Q.   Okay.  So where can I find the information to

15   support those numbers?

16       A.   I'm not sure if they were provided or not in what I

17   have.  We would have the information certainly at the

18   office.

19       Q.   Is that something you could provide?

20       A.   Yes.

21       Q.   And what would that be called?

22       A.   It would be a breakdown of the legal balance found

23   on -- the document would be our legal board, B-O-A-R-D.

24       Q.   Okay.  So you can provide that.  Is that perhaps

25   something you can get at the lunch break?

Page 28

1        A.   I believe so.

2             MR. DICKMEYER:  I mean I think.

3             MS. HENRY:  We can try and we can come back and talk

4    about it then.

5        Q.   So then besides that, on a general basis, can you

6    tell me what legal costs and legal fees means to you?

7        A.   Sure.

8        Q.   Or means for Merchants?

9        A.   Can I refer to one of your exhibits?

10       Q.   Sure.

11       A.   So --

12       Q.   Which exhibit are you looking at, just so we're on

13   the same page?

14       A.   Maybe I don't need to.

15       Q.   Okay.

16       A.   The legal fees would be the statutory fees and the

17   filing fees, garnishment fees, and things of that nature.

18   The cost associated with us generating the legal, those are

19   added to the account by the court.  And then we also have,

20   for our internal purposes, we have prejudgment interest that

21   is included in our legal fee bucket internally at Merchants

22   Credit.

23       Q.   So you apply fees to interest before applying it to

24   the principal?

25       A.   What do you mean by "fees"?

1       Q.   Payments is what I should say, payment or

2   garnishment payments; any payments that come in after a

3   judgment?

4       A.   We're not supposed to, as I understand the

5   procedure.  The money is applied to the hard cost, the

6   attorney fees, the filing fees, garnishment costs, things of

7   that nature.  The way we conduct business is we apply

8   interest at the end after the principal gets paid, as I

9   understand it.

10      Q.   Okay.  We'll come back to that when you have the

11  documents; is that fair?

12      A.   Yes.

13      Q.   We'll come back to Exhibit 6 also.  But for now,

14  don't have it go far away.

15           (Exhibits 7 and 8 marked.)

16      Q.   I've handed to you Exhibit 7 and 8.  Exhibit 7 is a

17  garnishment from the district court in the Dickerson matter

18  collecting on the prior judgment from Exhibit 3; is that

19  correct?

20      A.   Yes.

21      Q.   And this document is dated July 6, 2011, correct?

22      A.   Yes.

23      Q.   And Exhibit 8 is another garnishment, collecting

24  again against the Dickersons, for the same judgment from

25  Exhibit 3.  And that's dated January 26th, 2012; is that

Page 30

1    correct?

2        A.   Yes.

3        Q.   Have you reviewed both of these garnishments in

4    preparation for today's testimony?

5        A.   I believe I have.

6        Q.   And were moneys collected from the Dickersons as a

7    result of this garnishment?

8        A.   May I refer to Exhibit 6?

9        Q.   Yes.

10       A.   (Witness reviews document.)  Money was posted on

11   November the 4th of 2011 towards the legal account towards

12   the judgment.  I'm not certain, without reviewing the notes

13   in more detail, if it was a result of these garnishments or

14   not.  But I believe it may have been.

15       Q.   So you're referring, again, to Number 3, halfway

16   down on page 5?

17       A.   Yes.

18       Q.   So there was a garnishment that we just looked at

19   that was Exhibit 5, correct?  So is Number 3 the result of

20   Exhibit 5 or Exhibit 7 in November 2011?

21       A.   I'm not certain.  I can try to determine that by

22   looking at the notes in detail if you want.

23       Q.   All right.

24       A.   Is it okay if I make notes or check marks?

25       Q.   No.  You can do it on his version.

Page 31

1        A.   I can do it without.   I believe that Exhibit 7

2    resulted in the payment that was posted on -- I don't

3    believe that there was a payment -- let me clarify that,

4    please.   The payment that was posted on -- it's January the

5    14th of 2011.   Have I been saying November?

6        Q.   Yes.

7        A.   It's January the 14th of 2011.   So I read that

8    incorrectly on my notes.

9        Q.   Okay.

10       A.   And January the 14th of 2011 appears to be the

11   result of the garnishment in Exhibit 5.

12       Q.   Okay.

13       A.   Would we need to go back and correct the record all

14   the way back on that because I think I said that date a

15   number of times.

16       Q.   I think you've just corrected it.

17       A.   Thank you.

18       Q.   But that was your testimony about Exhibit 5 so that

19   this amount was related to Exhibit 5.   So now we're talking

20   about Exhibit 7.   So did Merchants Credit receive any funds

21   from their garnishment collection that was filed on July

22   6th, 2011 with the court?

23       A.   It does not appear to be the case.

24       Q.   Do you know why there were no funds collected from

25   that garnishment?

1      A.  (Witness reviews document.)  We received

2  communication about a chapter 13 bankruptcy that was filed

3  by the consumer.

4      Q.  What happened when that bankruptcy was filed?

5      A.  What do you mean "what happened"?

6      Q.  What happened to the amounts that were garnished?

7      A.  I don't believe that we received any money from the

8  garnishment if you're referring to the garnishment in

9  Exhibit 7.

10     Q.  Okay.  Because of the bankruptcy or for other

11 factors?

12     A.  May I read the notes first?

13     Q.  Sure.

14     A.  Thank you.  We received information on the chapter

15 13 and we released the writ of garnishment.

16     Q.  And did that bankruptcy complete?

17     A.  I believe that it was dismissed.

18     Q.  Okay.  And it was dismissed about what date, based

19 on your notes?

20     A.  We received notice of dismissal on January the 9th,

21 according to our notes, and it was dismissed on December the

22 9th of 2011.

23     Q.  Okay.  And were there any attempts at garnishing

24 after the release went in?

25     A.  I believe there were.

Page 33

1    Q.  So if I'm looking at Exhibit Number 8, the next

2  garnishment was a year later -- or no -- sorry -- six months

3  later in January 2012; is that correct?

4    A.  Yes.

5    Q.  And did Merchants receive any payment from this

6  garnishment?

7    A.  I don't believe we did.

8    Q.  Can you tell me why or why not?

9    A.  (Witness reviews document.)

10    (Exhibit 9 marked.)

11    A.  I believe that we released the writ of garnishment.

12    Q.  Due to what reason?

13    A.  I'll try to answer the best I can based on my review

14  of the notes.  We discovered that the chapter 7 was filed by

15  Mr. -- and I don't have his name here in front of me -- and

16  he was married to Shirley Dickerson and there were accounts

17  in the file that -- there was an account in the file that

18  was incurred during the time in which they were married.

19  And so the position of our office appears to be that that --

20  the bankruptcy would be -- we would be stayed from executing

21  a garnishment at that point in time because of a debt

22  included in the judgment that was part of the marital

23  community.

24    Q.  Okay.  So I'm going to give you the next Exhibit 9.

25  So that garnishment was stopped due to Demetrius Dickerson's

Page 34

1    chapter 7 bankruptcy, wasn't it?

2         A.   I believe so.

3         Q.   You're looking at Exhibit 9.  Is that a document you

4    received?

5         A.   I believe we did.

6         Q.   What is this document?

7         A.   This would be discharge of debtor in bankruptcy.

8         Q.   This discharge of debtor says that it was February

9    12th, 2012, correct?

10        A.   Yes.

11        Q.   And that prompted your office to release the

12   garnishment against Shirley Dickerson and her husband,

13   correct?

14        A.   This document or the bankruptcy?

15        Q.   No, the bankruptcy filing on February 12, 2012?

16        A.   Yes.

17        Q.   And that was Case Number 12-11284, correct?

18        A.   I believe so.

19        Q.   It was in the name of Demetrius Bertrand Dickerson

20   Senior, correct?

21        A.   Yes.

22        Q.   And you were just saying that this stalled

23   collection on the judgment that was entered as Exhibit 3

24   that you've testified about, correct?

25        A.   Yes.

1      Q.  And when your office received this discharge

2  reflecting that the discharge was entered on June 12th,

3  2012, what did you do with the debt?

4      A.  What was the question again, please?

5          (Reporter read back as requested.)

6      A.  I can't find the note line in here where we received

7  the actual discharge.  I see on line 1074 a reference to

8  Banko has been discharged and then an explanation of what

9  was going to happen with the debt.

10     Q.  So you're on page 33 of your notes, right?

11     A.  Yes.

12     Q.  Reviewing this note, can you tell me what was

13  entered in your system upon the discharge?

14     A.  Yes.  The account that was incurred while the

15  consumer was married was discharged and the balance was

16  adjusted on our system and we continued to attempt to

17  collect on the bill that was incurred prior to the marriage.

18         (Exhibit 10 marked.)

19     Q.  Okay.  I'm going to have you look at Exhibit 10.

20  That exhibit was sent over to me in discovery.  Can you tell

21  me what that exhibit reflects?

22     A.  I believe that it's a Washington State or King

23  County marriage record for Shirley Dickerson and Demetrius

24  Bertrand.

25     Q.  And did Merchants Credit pull that related to this

 1   file?

 2       A.  If we sent it to you, we must have.

 3       Q.  So at the time -- and do you know when that was

 4   pulled?

 5       A.  No.

 6       Q.  Well, you just read a note --

 7       A.  Can I clarify?

 8       Q.  Yes.

 9       A.  I don't know when this was pulled.  I remember from

10   the review of the notes when we were working on the release

11   of the judgment that marital records were reviewed, so this

12   would have been in 2012.

13       Q.  Okay.  So by 2012 the marital records were reviewed

14   by Merchants?

15       A.  I believe so.

16           (Exhibits 11 and 12 marked.)

17       Q.  So I want to have you look at your collection notes,

18   Exhibit 6, on page 31 and I want you to familiarize yourself

19   about what happened at Merchants when notice of the

20   bankruptcy was received till the time of the releases that

21   were entered that are Exhibit 11 and 12 that have just been

22   handed to you.

23       A.  Can you direct me to the appropriate note line to

24   start?

25       Q.  Well, I'm on page 31, so maybe you can just review

1   most of 31.  Take some time to review all of that and then

2   we can go over it.

3        A.  (Witness reviews document.)

4        Q.  Okay.  So it's true that a release was initiated

5   upon the filing of the bankruptcy; the garnishment was

6   released, correct?

7        A.  I believe so, yes.

8        Q.  Looking at Exhibit 11, initially it was only a

9   partial release, correct?

10       A.  Yes.

11       Q.  Can you tell me why it was only a partial release?

12       A.  I don't know specifically.  Our notes appear to

13  indicate it is because one account in the judgment was

14  incurred prior to the marriage and the other account was

15  incurred after the consumers were married.

16       Q.  And release was initiated after Mrs. Dickerson

17  called your office to notify you about the bankruptcy,

18  correct?

19       A.  I believe so, yes.

20       Q.  And upon her call, only a partial release was

21  allowed, right?

22       A.  I believe so.

23       Q.  Okay.  And then looking at Exhibit 12, at some point

24  a full release of that garnishment was issued, right?

25       A.  I believe so, yes.

1      Q.  And that was only done based on the request of her

2  attorney, correct?

3      A.  Is that information on page 31?

4      Q.  Again, I'm going to have you look at your notes.

5  You can tell that the release was issued on -- were filed on

6  March 8th, 2012.  So feel free to take your time to answer

7  that question.

8      A.  Thank you.  (Witness reviews document.)  Can you

9  please repeat the question?

10          (Reporter read back as requested.)

11      A.  I don't know if that was the only reason.  We did

12  have communication with her attorney.

13      Q.  So the attorney called you too.  So the consumer

14  called and a partial release was issued and then there was a

15  follow up from Mr. Bertrand's bankruptcy attorney

16  specifically asking for a full release, correct?

17      A.  I don't know exactly what the conversation was.  We

18  did receive a phone call from the attorney, and it was

19  agreed that we would go ahead and release the garnishment.

20      Q.  Okay.  So I'm going to refer to page 32.  I believe

21  on the left you have it starting on line 1042 through 1052.

22  Maybe you can read that note into the record.

23      A.  Sure.  "Received message from attorney's office.  He

24  said there was a stay for the community while the Banko was

25  active.  I said that I have no problems stopping the

1    garnishment until the Banko is discharged.  Once it is then

2    the garnishment will continue.  He said that he has no

3    problem with that since the debt itself does not fall under

4    the community property.  I asked that he let the consumer

5    know that.  We will honor the stay and release the

6    garnishment but when Banko is discharged garnishment will

7    start back up.  He said okay.  Emailed to Daniel to

8    release."

9         Q.  Okay.  And who is the collector that took that call?

10        A.  That was Lori Lee Westcott (Phonetic).

11        Q.  And what is her position?

12        A.  She was a legal clerk at that time.

13        Q.  And that information, how did Merchants have that

14   information about what to do with this debt?

15        A.  What do you mean?

16        Q.  You just talked about a communication with the

17   attorney as to what you were going to do.  And I'm asking

18   how Merchants came to that conclusion?

19        A.  What conclusion?

20        Q.  About what you just read.

21        A.  I don't know for sure.  I assume, from reading these

22   notes, we came to the agreement or conclusion based on the

23   telephone conversation with an attorney.

24        Q.  So it says here they "received the message from the

25   attorney's office."  I don't see here that you ever called

1   the attorney back.  Do you see a note that says that?

2       A.  I don't.

3       Q.  So the information you just read is an internal

4   note, correct?

5       A.  It is.

6       Q.  And so does it reflect anything else other than the

7   attorney asked that the garnishment be released?

8       A.  It reflects on line -- and, again, I don't know.  I

9   wasn't part of the conversation -- but on 1043, at the end

10  it reflects that I said that I have no problem stopping the

11  garnishment.  I assume when I'm reading these notes, there

12  was a conversation.

13      Q.  How do you know if there was a phone call?  Do you

14  have a record of that phone call?

15      A.  I don't believe we do since it's old.

16      Q.  But do you have a record that a phone call was made?

17      A.  I don't know.

18      Q.  Because I see here only that there was a message

19  received, correct?  You see that too?

20      A.  I see that too, yes.

21      Q.  So from what we know with this record, all we know

22  is that a message was received from an attorney and an email

23  was sent to Danielle, correct?

24          MR. DICKMEYER:  Objection.  I think that misstates

25  the record.  It misstates the excerpt of page 32.

Page 41

1      Q.  Go ahead and answer.

2      A.  When I read the notes, I'm under the assumption

3  there was a conversation based on the notes.

4      Q.  But you don't know for sure?

5      A.  I don't know for sure.

6      Q.  There's also -- I'm going to refer you to the notes

7  from 1026 until 1041.  It seems that the debtor was emailing

8  Merchants, correct?

9      A.  Line 1026.

10     Q.  Till 1041.

11     A.  And your question is whether or not the consumer was

12  emailing us?

13     Q.  Correct.

14     A.  (Witness reviews document.)  I believe that Ramona

15  in line 1026 works for the consumer's place of employment

16  and that Ramona is stating that she -- that the consumer is

17  constantly emailing her.

18     Q.  Okay.

19     A.  I don't believe there's any email referenced to

20  Merchants Credit.

21     Q.  So then at this point this is Ramona at the debtor's

22  workplace?

23     A.  I believe so.

24     Q.  She was communicating with Merchants?

25     A.  Yes.

Page 42

```
1        Q.   So there wouldn't be any other emails directly from

2   the consumer to Merchants?

3        A.   No.

4        Q.   And was an attorney ever consulted by Merchants?

5        A.   I believe I saw a note in here that we spoke to Bob

6   Friedman about it.

7        Q.   Bob Friedman would be the attorney for Merchants?

8        A.   Yes.

9        Q.   Did he give you some advice about how to handle

10  this?

11       A.   I did not -- I don't know for sure.  I did not see

12  that in the notes.

13       Q.   Well, at some point a note was put in the system to

14  start garnishing again, correct?

15       A.   Yes.

16       Q.   And I'm looking at the note on page 32, line 1054

17  and 1055.  It seems that Merchants took the position that

18  they could regarnish once the bankruptcy was closed, right?

19       A.   Yes.

20       Q.   How did they make that determination?

21       A.   I assume it was based on a conversation with Bob.

22       Q.   Do you have any policies or procedures concerning

23  community property debts?

24       A.   I'm not sure -- what do you mean specifically?

25       Q.   Well, I'm just asking why it was that Merchants took
```

Page 43

1   the position that they could start regarnishing their debt

2   if this is something that Merchants commonly does, and do

3   you have a policy and procedure concerning it?

4       A.  We have work instructions on what we do when we

5   receive bankruptcy information, the way we process it and

6   what we do, etc., and then the way we rely on bankruptcy to

7   guide what we do and everything else.  And are you

8   talking -- maybe you can clarify the question.  I'm not

9   trying to be difficult.

10      Q.  I'm talking specifically about community debts.

11      A.  Do we have a work process in place?

12      Q.  Do you have any policies and procedures concerning

13  community debts?

14      A.  Yes.

15      Q.  Have you provided them to me?

16      A.  I'm not so certain.

17      Q.  Do you have any specific policies and procedures

18  regarding community property debts that are in bankruptcy?

19      A.  Yes.

20      Q.  Okay.  And I'm going to have you look at the

21  policies and procedures here that have been provided to me

22  and then maybe you can tell me where that information is.

23          (Exhibit 13 marked.)

24      Q.  You're looking at Exhibit 13.  These are the

25  policies and procedures that you provided to me in

Page 44

1    discovery.  Have you had a chance to review them in

2    preparation for today's deposition?

3         A.  Yes, I have.

4         Q.  There's several.  I'm going to start with -- they're

5    going to be in Exhibit 13.  We have final bankruptcy notice,

6    which is dated document 306; printed screens for bankruptcy,

7    document 105; trial desk bankruptcy, document 401; logging

8    in bankruptcy money, document 909; print screen for

9    bankruptcy, document 909.  Do you have all those?

10        A.  Yes.

11             MS. HENRY:  And maybe we can list them on the record

12   as subparts.

13             THE COURT REPORTER:  Sure.

14        Q.  So if you can review those, that's what's been

15   provided in discovery.  Is there anything here about

16   community debts in bankruptcy?

17        A.  (Witness reviews documents.)  I don't believe so.

18        Q.  Okay.  So do you have any other policies and

19   procedures regarding community property debts?

20        A.  With regards to bankruptcy?

21        Q.  No.

22        A.  What do you mean by "policies and procedures"?

23        Q.  How do your collectors know how to deal with

24   community property debts?

25        A.  The way we've done it is if the bill was incurred

1   while the consumers were married, then they're both liable.

2   If the bill was not incurred during the marriage, then one

3   spouse would not be liable.

4        Q.  So you testified earlier in the beginning of your

5   deposition that sometimes items are kicked to you

6   personally.  Would this be -- would all community debt

7   issues be kicked to you personally for a decision?

8        A.  I don't think all would, no.

9        Q.  So is there a policy and procedure for them?

10       A.  Are you talking about bankruptcy or just in general?

11       Q.  No.  I'm talking about community property debts.

12       A.  We follow the Washington State Community Property

13  Laws as our policy or whatever the specific state is.

14       Q.  But you don't have any specific policy training your

15  collectors on that, do you?

16       A.  Well, I don't think that's a fair statement.  No,

17  that's not accurate.

18       Q.  So what is accurate?

19       A.  What's your question?

20           (Reporter read back as requested.)

21       A.  Our collectors are trained on FDCPA and the state

22  collection laws and community property laws.

23       Q.  Under Washington State?

24       A.  Yes.

25       Q.  But you don't have a separate manual about how to

1    deal with collection of community property debts?

2         A.  We don't have a separate manual for that, no.

3         Q.  So how do your collectors know how to deal with the

4    issues?

5         A.  If the consumers are married at the time of service

6    -- we thought it was relatively simple -- if the consumers

7    were married, they're both liable.  If they weren't married

8    when the debt was incurred, then the person who did not

9    incur the debt is not liable.

10        Q.  And that's a situation under every circumstance?

11        A.  Just about every circumstance that I can think of.

12        Q.  And that's how you train your collectors under

13   Washington law?

14        A.  That was our understanding, yes.

15        Q.  And that's how you train your collectors even if a

16   bankruptcy is involved?

17        A.  As I understand your question, I believe so, yes.

18        Q.  And is there a reason that community property debts

19   would ever be taken to you or an attorney for additional

20   guidance?

21        A.  Could you say that question again?

22        Q.  Is there any reason why a community property debt

23   issue would be kicked to you or to your in-house attorney

24   for additional guidance?

25        A.  If we get a letter from you, for example, or an

1   attorney or a letter -- a concern from a consumer, we might

2   ask for guidance.

3        Q.  So a letter from an attorney gets kicked to legal?

4        A.  Perhaps, yes.

5        Q.  Yes or no?

6        A.  In most cases.

7        Q.  Do you ever have a letter from an attorney that's

8   not kicked to legal?

9        A.  Yes.

10       Q.  And you said in some circumstances concerns from a

11  consumer are sent to legal, correct?

12       A.  Yes.

13       Q.  And were concerns for the consumer here ever sent to

14  legal?

15       A.  I believe I testified on that that we received

16  information that we communicated with Mr. Friedman's office?

17       Q.  Yes.

18       A.  Yes.

19       Q.  That was after you received information from her

20  attorney, correct?

21       A.  I believe it was -- I would have to go back in the

22  notes.  I think it was prior to that.  I think it was just

23  when she contacted us initially.

24       Q.  Okay.

25           (Exhibit 14 marked.)

1      Q.  Have you reviewed this exhibit prior to today's

2  testimony?

3      A.  Yes, I have.

4      Q.  And this is another policy and procedure that is

5  just about garnishment and bankruptcy, correct?

6      A.  I believe technically this is referred to in our

7  office as a work construction.

8      Q.  So what is a "work construction"?

9      A.  It's a little more granular than the policy and

10  procedure.  It gives details on what to do and like, for

11  example, in some cases, key strokes and things of that

12  nature.

13      Q.  So what's the difference?

14      A.  If somebody could explain that to me, I would be

15  real happy because I'm not certain I know.

16      Q.  Are they treated functionally different in your

17  office?

18      A.  A little bit, yes.

19      Q.  Okay.  Explain how.

20      A.  The policy and procedure would be the broad scope;

21  and the work construction would be more on the worker bee

22  level and how they process the work.

23      Q.  So you have bankruptcy instructions for your

24  collectors, correct?

25      A.  Yes, that's what we've sent you.

Page 49

1     Q.  Why?  Is there something you haven't sent me?

2     A.  No.

3     Q.  Okay.

4     A.  No.  We have bankruptcy instructions for our clerks

5  to process the bankruptcies when the bankruptcy information

6  is received and then we have a process in place for what the

7  collector does when they're made aware of a consumer filing

8  a bankruptcy.  And I'd like to explain that.

9         For example, if we make a collection call and the

10  consumer says, "I have filed bankruptcy," then the collector

11  has a certain process that they would file.  The collector

12  doesn't receive the notice of bankruptcy or anything like

13  that via the mail.  That would be handled by our bankruptcy

14  clerks.

15     Q.  But that was all in Exhibit 13, correct, all of

16  those procedures?

17     A.  I think so.  We sent you everything that we had, to

18  the best of my knowledge.

19     Q.  All right.  And one of those procedures in Exhibit

20  13 dealt with garnishments specifically, correct?

21     A.  I don't think so.

22     Q.  I think we're on the same page.  So now we're just

23  going to focus our time on Exhibit 13.  This deals with just

24  the garnishment case.  In the Dickerson case, they were in

25  the middle of a garnishment when the bankruptcy was filed,

Page 50

1    correct?

2        A.  Yes.

3        Q.  And there was a partial release and then a full

4    release.  But ultimately the writ of garnishment was

5    released, correct?

6        A.  I believe that was the case on one of the exhibits

7    that you showed me.

8        Q.  And is this the only exhibit that will relate to

9    what to do in a circumstance concerning the Dickersons'

10   bankruptcy?

11       A.  I believe this is what is in play now.  I'm not

12   certain exactly how it was handled in 2012.  I assume it was

13   fairly similar.

14       Q.  You don't know whether this was the policy in place

15   in 2012?

16       A.  I don't know.

17       Q.  But it's the policy in place now?

18       A.  I believe so.

19       Q.  So as of today, no garnishment is released upon a

20   bankruptcy filing unless you had notice from the attorney;

21   is that correct?

22       A.  That's not correct.

23       Q.  Okay.  Tell me why not.

24       A.  Well, we might receive notice of filing from the

25   court or from the consumer or some other source.  It's not

Page 51

1   necessarily just from the attorney.

2       Q.  Well, for a chapter 7, I'm going to refer you to the

3   middle of the first page on Number 14.  Under the Banko

4   refund review, go ahead and read your note there in Number

5   1.

6       A.  Exhibit Number 14?

7       Q.  Yes.

8       A.  In Number 1?

9       Q.  Number 1, under the "Banko refund review."

10      A.  "Banko refund review:  Make sure that the request

11  for the funds held in the 90 days prior to the Banko filing

12  is scanned to the packet.  All requests for funds returned

13  due to the Banko filing must be in writing!"

14      Q.  So if they're not in writing, do you refund?

15      A.  I don't know.

16      Q.  Okay.  By your policy and procedure you don't,

17  right?

18      A.  That would appear to be the case based on this

19  document.

20      Q.  But this is the -- these are the policies and

21  procedures and work orders that you have concerning

22  garnishments?

23      A.  I believe so.  This is what was sent to you.  I'd

24  like to clarify, if I could.  Can I explain it a little bit?

25      Q.  Sure.

1      A.  I don't do this specific work, so I don't know

2    exactly how it's done right now.

3      Q.  Okay.  So when the bankruptcy was filed in 2012 and

4    the discharge was entered and the garnishment was released,

5    Merchants didn't collect for several years; is that right?

6      A.  That appears to be correct.

7      Q.  Why was that?

8      A.  I don't believe that we knew how to collect it or

9    where to collect it from and the consumer didn't pay.

10     Q.  But there were no other garnishments issued for

11   several years, right?

12     A.  That is correct.  I want to take that back.  I

13   believe, from reading the notes, that we tried to but that

14   the consumer had terminated her employment.  May I look at

15   the notes to answer that?

16     Q.  Sure.

17     A.  (Witness reviews document.)  What was the question

18   again?  I'm sorry.

19         (Reporter read back as requested.)

20     A.  I believe that my original answer is accurate; that

21   it was several years before we garnished again.

22     Q.  Okay.

23         THE WITNESS:  May I use the bathroom real quick?  Is

24   that okay?

25         MS. HENRY:  Let's take a break for a minute.

Page 53

1          (Brief recess.)

2          (Exhibit 15 marked.)

3      Q.  I have handed you Exhibit 15.  This is a writ of

4   garnishment that was filed with King County District Court

5   in April 18th, 2018.  Merchants Credit is trying to collect

6   against Shirley Dickerson and her husband, correct?

7      A.  Yes, John Doe Dickerson, her husband.

8      Q.  John Doe, her husband, correct?

9      A.  Um-hmm.

10     Q.  Have you reviewed this document prior to today's

11  testimony?

12     A.  I believe I have, yes.

13     Q.  And this is the only garnishment that has been filed

14  since Mr. Dickerson's bankruptcy, right?

15     A.  I believe so.

16     Q.  And as a result of his bankruptcy, were there any

17  efforts to modify the judgment with the court?

18     A.  I believe so, yes, um-hmm.

19     Q.  What would those be?

20     A.  As I understand it, there were two accounts in the

21  judgment.  And one of the accounts was removed from the

22  judgment because it was incurred while Shirley Dickerson and

23  her husband were married.

24     Q.  Did you inform the court of this removal from the

25  judgment?

Page 54

```
 1      A.  I believe so.
 2      Q.  I'm not aware of any court documents.  Have you
 3  provided any documents in discovery?
 4      A.  I'm not sure.
 5      Q.  Well, I will inform you that there has been no
 6  information to the court.  Would you like me to pull the
 7  docket for the court?  Would that be helpful for you to
 8  review?
 9      A.  I would need to consult with the attorney on that.
10  I'm not certain.
11      Q.  We can wait.
12          MS. HENRY:  Let's go off the record for a minute.
13          (Discussion off the record.)
14          (Brief recess.)
15          (Reporter read back as requested.)
16          (Exhibit 16 marked.)
17      Q.  I'm going to have you look at your collection notes.
18      A.  Could I clarify my answer?
19      Q.  Did you have a chance to look at them while we took
20  the break?
21      A.  Yes.
22      Q.  So you also have Exhibit 16, which is a docket of
23  the district court case that I pulled.  So we have that
24  docket plus it sounds like you've had a chance to look at
25  your collection notes.
```

1      A.  Yeah.  My clarification is -- if I understand the

2  question properly -- we released the writ of garnishment

3  through the court.  Was your question, did we inform the

4  court of --

5      Q.  Of anything after the bankruptcy discharge was

6  entered.

7      A.  Our notes indicate that we released the writ of

8  garnishment.  Our notes don't indicate that we informed the

9  court of anything after that.

10     Q.  So you didn't inform the court to change the

11 judgment?

12     A.  I don't believe so.  Our notes don't reflect we did.

13     Q.  But internally you did that after the bankruptcy?

14     A.  I believe so, yes.

15     Q.  And what did you do?

16     A.  We removed the account that was incurred while the

17 consumers were married, the judgment.

18     Q.  But when you started collection in April of 2018,

19 you're collecting on the same judgment that was entered

20 prior to Mr. Dickerson's bankruptcy filing, correct?

21     A.  Correct.

22     Q.  What made you start collecting again?

23     A.  We discovered where Ms. Dickerson was working, I

24 believe.

25     Q.  Did you consult an attorney before restarting

Page 56

1    collection?

2        A.   I don't believe so.

3        Q.   Why not?

4        A.   We didn't realize there was any type of issue or

5    problem in reinitiating collection on it.

6        Q.   But you knew that there was bankruptcy in a

7    discharge, correct?

8        A.   Correct.

9        Q.   And so you said there was some action taken.  When

10   was that action taken?

11       A.   What do you mean "action"?

12       Q.   You said one of the judgments was removed

13   internally.  When was that action taken?

14           MR. DICKMEYER:  Object to the question.  I think

15   that mischaracterizes his answer.  There was only one

16   judgment.

17       Q.   I can rephrase the question.

18           So let's just try to go over.  What actions were

19   taken by Merchants Credit after the discharge was entered by

20   Mr. Dickerson?

21       A.   We removed the account that the date of service was

22   while the consumers were married.

23       Q.   In 2012?

24       A.   In 2012 -- what?  Is that when we --

25       Q.   Did you do those actions in 2012?

Page 57

1     A.  Let me refer to my notes.  I do believe so.  I'm
2  looking at line 1013 in our collection history.  And there's
3  a reference to "new balance due is as follows after Banko
4  reduction."  So I do believe that the balance was changed in
5  2012.
6     Q.  To how much?
7     A.  I'm going to read 1013, if that's okay.
8     Q.  Um-hmm.
9     A.  "New balance due on writ is as follows after Banko
10 reduction, principal $1,517.18 plus $186.16 of interest,
11 $302.41 fees.  Partial writ released to court, faxed to POE,
12 copy to file, new balance due is $2,005.75."
13    Q.  Okay.  And so how did you come to that figure?
14 There had been prior garnishments before that we had
15 discussed.  Had any of those amounts been allocated to this
16 account?
17    A.  I believe so.
18    Q.  Okay.  But that's what you had as remaining?
19    A.  Correct.
20    Q.  So had the other judgment that had been removed, had
21 it already been paid off?
22    A.  What do you mean the "other judgment"?
23    Q.  I'm sorry.  I misspoke.  The other date of service.
24 It was removed from the account.
25    A.  Yes.

Page 58

1     Q.   Had that been paid off?

2     A.   It was removed and discharged in the bankruptcy.

3     Q.   Yes, but had it been paid off before that?

4     A.   No.

5     Q.   Do you have an accounting of which funds went to

6  which account?

7     A.   Yes.

8     Q.   What page are you looking at?

9     A.   Page 5.

10     Q.   Okay.

11     A.   On Exhibit 6, halfway down, sequence 3, $522.33 was

12  applied to account A0286726 to the principal.

13     Q.   And how do you know which date of service that is

14  referring to?

15     A.   Each date of service is assigned an individual

16  account number.

17     Q.   So were you able to figure out which date of service

18  that account was for?

19     A.   Yes.

20     Q.   '06 or '08?

21     A.   The 0826726 is for a date of service in June of '06.

22     Q.   Okay.

23     A.   And that's on page 1 of Exhibit 6, about halfway

24  down, sequence Number 1.

25     Q.   Okay.  So halfway down, sequence 1 shows that that

 1   was applied to that 6/10/06 service?

 2        A.  6/10 of '06, yes.

 3        Q.  Leaving a balance of $972.16?

 4        A.  Of principal, yes.

 5        Q.  Okay.  So if that's the case, then we're looking at

 6   page 32.  Why does it say the principal is $1,517.18?

 7        A.  I don't know.

 8        Q.  But you do recognize that seems to be a discrepancy,

 9   correct?

10        A.  That's what it says, yes.

11        Q.  Is that something that you can look into and get a

12   resolution at a later time?

13        A.  I believe so, yes.

14        Q.  Perhaps at the lunch break?

15        A.  Perhaps.

16        Q.  So in any case, your files here say that you're

17   collecting $2,005.75, correct?

18        A.  That's what our notes indicate, yes.

19        Q.  So how much was owing by your collection notes at

20   the time of the garnishment in April 2018?

21        A.  Line 1377 shows the balance on the writ would be

22   $2,972.01.

23        Q.  1377, that would reflect what you were collecting on

24   as in April of 2018?

25        A.  That appears to be the case, yes.

1        Q.  I'm looking at line 1376.  Is that the breakdown?

2        A.  Yes, that's the breakdown on 1376.

3        Q.  Could you read those numbers into the record?

4        A.  Writ 6, 1517.18 prin --

5        Q.  "Prin" stands for what?

6        A.  Principal.

7        Q.  Okay.

8        A.  $1305.71 int.

9        Q.  "Int" stands for?

10       A.  Interest.  $149.12 Fees.

11       Q.  And "Fees" refers to...

12       A.  Fees.

13       Q.  What fees?

14       A.  I'm assuming it's garnishment fees but I'm not

15   certain of that.

16       Q.  So on a principal of $1,517.18, collecting interest

17   of $1,305 and fees of $149.12.  Is that your testimony?

18       A.  That's what our notes indicate.

19       Q.  Okay.  So upon the bankruptcy filing, Shirley

20   Dickerson started calling your office; is that right?

21       A.  Which bankruptcy?

22       Q.  I mean -- sorry.  As a result of the garnishment, in

23   April 2018 Shirley Dickerson started calling your office,

24   correct?

25       A.  That appears to be the case, yes.

1      Q.  And she called the office several times; is that

2  correct?

3      A.  If I take a look at the notes here, I think so.

4      Q.  Well, did you review the phone calls prior to

5  today's testimony?

6      A.  Yes, I did.

7      Q.  I was given a number of recordings from your

8  attorney recording those phone conversations.  Are you aware

9  of that?

10     A.  Yes, I am.

11     Q.  Okay.

12         MS. HENRY:  So for ease of today, I'm going to hand

13  the court reporter a jump drive with those recordings.  I

14  can send you exactly what's on this jump drive if you had a

15  computer you could take a look.  But assuming you don't

16  object, I'm going to ask that she take these recordings on

17  this jump drive and do a transcript into the record and

18  label them appropriately.  Is that agreeable to you?

19         MR. DICKMEYER:  I mean on your representation that

20  the thumb drive has the same exact copy of the audio files

21  that I sent to you as part of the production.

22         MS. HENRY:  It is.

23         MR. DICKMEYER:  Then I'm fine with that procedure.

24         MS. HENRY:  So if we can break for a minute.

25         (Discussion off the record.)

Page 62

1          (Lunch recess 12:16 to 1:23 p.m.)

2          (Exhibit 17 marked.)

3          MS. HENRY:  Exhibit 17 consists of 17 audio

4    recordings and they'll be listed A through whatever

5    alphabetically as an exhibit.  And I can put on the record

6    that they are the exact recordings that were given to me by

7    Mr. Dickmeyer and with those assurances that the goal would

8    be that your client agreed to have them be referenced in the

9    deposition as an exhibit to your deposition.

10         MR. DICKMEYER:  That's fine, subject of course to

11   the right to comment just as part of the signature process.

12   That would only be it.

13         MS. HENRY:  Just to the court reporter, we went over

14   the naming of those files having certain dates on them and

15   we can discuss after the deposition, if you need to, in

16   order to reference them appropriately for the record.

17         THE COURT REPORTER:  Okay.  I think he was clear.

18         MS. HENRY:  Okay.

19      Q.  So with that resolved, so, Mr. Wiswall, for purposes

20   of today's deposition, I was given a number of recordings,

21   17 by your attorney.  They're being referenced on the record

22   as Exhibit 17.  We're not going to go through those today on

23   the record but they will be listed as transcripts to this

24   deposition.  Did you review those recordings prior to

25   today's testimony?

Case 12-11284-MLB   Doc 35-1   Filed 09/24/18   Ent. 09/24/18 20:27:48   Pg. 63 of 100

Page 63

1     A.  I believe so.

2     Q.  You're familiar with the general contents of those

3   recordings?

4     A.  Yes.

5     Q.  And for purposes of discussing what those recordings

6   are, I'm going to refer you back to Exhibit Number 6.  It's

7   my understanding that there's references in the record to

8   several calls from my client that are put into the

9   collection notes; is that correct?

10    A.  Yes.

11    Q.  And is it generally Merchants Credit's practice to

12  notate every call made by a consumer in the collection

13  notes?

14    A.  Yes.

15    Q.  So would I find all 17 calls here in the collection

16  notes?

17    A.  You should.

18    Q.  And can we agree that where they're referenced here,

19  there's summaries of the calls that will be in more detail

20  in the recordings?

21    A.  They should be.

22    Q.  So we left off before with the garnishment happening

23  on April 18, 2018, and that's Exhibit 15.  Do you recall

24  that?

25    A.  Yes.

Page 64

1     Q.  Okay.  I believe before the break we were on page 38

2  of the collection notes and you had just gone over line 1376

3  and 1377.  Does that meet with your recollection?

4     A.  Yes.

5     Q.  Okay.  So can you tell me, did my client call you

6  shortly after that garnishment was filed?

7     A.  She appears to have called on April the 30th.

8     Q.  Okay.  And was she disputing your right to collect

9  on this garnishment?

10    A.  That appears to be the case.

11    Q.  And she informed you about the bankruptcy filing

12  from 2012, did she not?

13    A.  I'm not sure based on these notes.

14    Q.  Okay.  Well, I'm going to send you to line 1385.  It

15  says there that she's disputing the garnishment again

16  regarding bankruptcy, correct?

17    A.  Correct.

18    Q.  Can you clarify what your uncertainty is?

19    A.  I can't recall the question you asked.

20        (Reporter read back as requested.)

21    A.  Let me explain.  The notes indicate she's disputing

22  the garnishment in talks about a bankruptcy but doesn't say

23  what year or what bankruptcy.

24    Q.  But she said she would follow up with a letter from

25  her attorney, correct?

Page 65

1     A.  Correct.

2         (Exhibit 18 marked.)

3     Q.  So I'm following up with Exhibit 18.  Is this the

4  letter that she followed up with that she referenced in the

5  notes here?

6     A.  I think so.

7     Q.  And what did your -- what did Merchants Credit do

8  when they received this letter?

9     A.  Is it appropriate to read the notes or just a

10 summary?

11    Q.  If you've already reviewed the notes, I think it's

12 appropriate for you just to tell to me what happened.

13    A.  We received the letter and the letter was sent to my

14 folder for review.

15    Q.  Did you review it?

16    A.  I did.

17    Q.  Aside from the notes, have you done any other

18 interviews or discussions with your team or anything else

19 about the circumstances that happened since April concerning

20 the garnishment on this debt?

21    A.  I have.

22    Q.  So is your knowledge about this debt confined to

23 only the notes here?

24    A.  Yeah, I believe so.  I don't understand your

25 question.

1     Q.  I just asked you, did you talk to anybody else on

2    your team, or anybody else at Merchants Credit, concerning

3    the circumstances of the garnishment since April of this

4    year?

5     A.  And I responded, I believe I have.

6     Q.  So then I asked you, so then your knowledge is not

7    confined to the issues only in this collection notes, is it?

8     A.  It's not.  I have other knowledge.

9     Q.  Okay.

10    A.  Sure.

11    Q.  So I'm asking you what happened when Merchants

12   received a fax from Ms. Dickerson in April?

13    A.  So the notes indicate that I received -- that we

14   received this letter and it was given to -- it was placed in

15   my folder for review.

16    Q.  What happened when you reviewed it?

17    A.  When I reviewed it -- let me look at the notes -- I

18   believe that I instructed our clerk to give to Jason for

19   review.

20    Q.  Why would it be given to you for review?

21    A.  I handle many of the disputes that come into our

22   office.  If the dispute is a little bit more than a general

23   dispute, they will give it to me and ask me what direction

24   should we take; should we write a letter to the consumer;

25   what type of investigation should we do or what have you.

Page 67

1        Q.  Well, this is a fairly general dispute, though,

2    isn't it?

3        A.  Not so much, I don't think.

4        Q.  Why is that?

5        A.  Based on the information in the notes -- it's not

6    general in that this is not something that we see every day.

7        Q.  You don't see community property debts being

8    discharged on a regular basis in your office?

9        A.  I don't know.

10       Q.  You don't keep track of that information?

11       A.  I don't personally.

12       Q.  Well, would debts like this get kicked to you for

13   additional review?

14       A.  I can't recall one like this.

15       Q.  Okay.  So -- go ahead.

16       A.  Go ahead and ask me the question and I'll try to

17   stick to answering them.

18       Q.  I find it hard to believe that you've never seen a

19   community property debt at Merchants Credit before?

20       A.  I think you would have to ask me a specific question

21   about it for me to have any type of specific recall, if

22   that's a fair answer.

23       Q.  Well, you seem to readily know how to handle debts

24   that are based on community property, right?

25       A.  I think I do.

1     Q.  Okay.  So if you readily know how to handle them,

2   then it's logical to assume that your office has dealt with

3   community property debt before, correct?

4     A.  I think that's a logical statement, yes.

5     Q.  And do they generally come to you?

6     A.  Not always.

7     Q.  Okay.  But the number that do, like how many in the

8   last year have come to you for review?

9     A.  I can't recall.

10    Q.  Well, can you give me an estimate?  More than ten?

11    A.  I don't know.

12    Q.  More than 20?

13    A.  I don't know?

14    Q.  Do you keep statistics?

15    A.  Not on this.  We keep statistics on disputes and

16  things of that nature.

17    Q.  Okay.

18    A.  But I don't know if we keep statistics specifically

19  to a community property type issue.

20    Q.  Okay.  And you don't keep any regular policies and

21  procedures concerning them either, do you?

22    A.  I think I've answered that.

23    Q.  Um-hmm.

24    A.  I don't know specifically what you mean.

25    Q.  Okay.  So let's go back to the debt here

1   specifically about the Dickersons.  So this came to your

2   attention?

3        A.  Yes.

4        Q.  What did you do when you reviewed their letter?

5        A.  I asked the clerk to go ahead and give it to Jason

6   for review.

7        Q.  And Jason is who?

8        A.  Our attorney, our general counsel.

9        Q.  And what's his name?

10       A.  Jason Woehler.

11       Q.  Okay.  And he's your in-house counsel?

12       A.  Yes.

13       Q.  And so Jason reviewed this letter and then what

14   happened?

15       A.  (Witness reviews document.)  What happened on the

16   file or what happened with regards to Jason?

17       Q.  You said you just sent it to Jason to review and

18   then I asked you what happened.

19       A.  I guess my question is, what happened with regards

20   to the handling of the account or what happened with regards

21   to Jason?

22       Q.  You can answer both, if you like.

23       A.  Okay.  Let me find the notes here.  (Witness reviews

24   document.)  We received it on April the 30th on line 1396.

25   I put it in my folder to review and that was on April 30th.

Page 70

1    I reviewed it on May the 3rd and I asked Pearla -- she's in

2    our compliance department and does my dictation -- to go

3    ahead and review the communication with Jason on line 1500.

4        Q.  Okay.  Let me stop you here.

5        A.  You bet.

6        Q.  So you didn't review it again until May 3rd?

7        A.  I didn't see it until May the 3rd.

8        Q.  Okay.  I thought you testified earlier that it came

9    into your bin back on April 30th?

10       A.  What I intended to say -- if that's what I said, I

11   misspoke -- it was received by our office by our clerk and

12   it was put into my folder to review on April the 30th.  I

13   didn't review it, according to our notes, until May the 3rd.

14       Q.  So let's go back to the note on May 1st where it

15   says it was emailed to Jason.

16       A.  What line is that?

17       Q.  1409.  Who is "Mel"?

18       A.  Melissa Mason, she's a supervisor.  What line is

19   that, please?

20       Q.  1409.

21       A.  "Email to Jason Mel."

22       Q.  So do collectors have regular access to email Jason

23   directly?

24       A.  Supervisors do.

25       Q.  Supervisors do.

Page 71

1        A.   In general, yes.

2        Q.   Okay.  And so you weren't part of this debt

3   initially, correct?

4        A.   With regards to the email?

5        Q.   With regards to the email or to review.

6        A.   I don't believe I was.

7        Q.   And then if we go to line 1413, go ahead and read

8   that.

9        A.   "Reviewed with Dana.  Debt in question was not

10  incurred before marriage therefore it was not a community

11  debt covered under the spouse's Banko as they were not

12  married at the time of service dsa."

13       Q.   Okay.  So looking at the notes here, if I go a

14  couple of lines before, it says, "Accessed by JRM; accessed

15  by DSA; accessed by MEL."  So can I surmise that those three

16  parties are the only ones that have seen this correspondence

17  prior to that note at line 1414 -- or 1413 through, I guess,

18  1416?

19       A.   What correspondence are you referring to?

20       Q.   I'm looking at lines 1410, 1411, and 1412.

21       A.   So I see that and your question was...

22       Q.   I see it accessed three times.

23       A.   Um-hmm.

24       Q.   And three different sets of initials.  I'm asking,

25  can I surmise that that means three different people

Page 72

1    accessed this letter for review?

2        A.  No.

3        Q.  Okay.  Then tell me what it means.

4        A.  It shows that on line 1410, 1411, and 1412 that

5    those three persons accessed these notes.  Whenever somebody

6    accesses the pack of notes, their initials are hard copied

7    in the file.  So these three people reviewed these notes --

8    or entered in the packet number and these notes popped up.

9        Q.  Is Jason any of those people?

10       A.  No.

11       Q.  So how do I know whether or not he reviewed the

12   correspondence?

13       A.  On these notes?

14       Q.  Um-hmm.

15       A.  I don't think that you can tell, based on these

16   notes right here that you're referring to.

17       Q.  So did you have any discussions with Melissa or this

18   other person whose initials are DSA?

19       A.  I don't know that I show I accessed the notes.

20       Q.  Well, I'm asking in preparation for today's

21   testimony.

22       A.  Oh.  Did I talk to these folks?

23       Q.  Yes.

24       A.  No, I haven't.

25       Q.  You didn't?

Page 73

```
 1       A.   No.

 2       Q.   Is there a reason why you wouldn't?

 3       A.   I didn't feel the need to.

 4       Q.   Okay.  So when it says here, "Reviewed with Dana,"

 5  what does that mean to you?

 6       A.   These notes were put in by DSA, who is Danielle

 7  Arrasmith, and she's indicating she "reviewed with Dana.

 8  Debt in question was not incurred before marriage therefore

 9  it was not a community debt covered under the spouse's Banko

10  as they were not married at the time of service."

11       Q.   So Melissa and Dana are not bankruptcy attorneys,

12  are they?

13       A.   No.

14       Q.   And Melissa and Dana are not attorneys at all, are

15  they?

16       A.   No.

17       Q.   And so at what point here do we have any information

18  that a bankruptcy or that an attorney has provided any

19  review of this file?

20       A.   In the notes?

21       Q.   Um-hmm.

22       A.   Is there a certain time period that you're looking

23  at or the whole...

24       Q.   I'm actually going through there.  So on the call on

25  May 1st, had anybody talked to an attorney yet?
```

Page 74

1    A.  I don't know.

2    Q.  So when the client called on May 1st, had anyone at

3 Merchants Credit talked to an attorney yet?

4    A.  Our notes indicate back in 2012 we had a

5 conversation -- we assumed had a conversation with the

6 attorney and then there was communication to Bob Friedman --

7 or are you talking about a certain date forward?

8    Q.  I'm just looking at your notes, sir.  So I'll look

9 at page 38 of the collection notes, line 1421 through 1425.

10 Maybe you can review that and we'll have the court reporter

11 ask the question again.

12    A.  (Witness reviews document.)

13       (Reporter read back as requested.)

14    A.  My records don't indicate anybody at Merchants

15 talked to an attorney after May 1st or after April 30th.

16    Q.  But they were waiting for an attorney to review,

17 correct?

18    A.  That seems to be the case.

19    Q.  And they indicated that was the situation when they

20 told the borrower that, correct?

21    A.  I believe that's the case, based on my recollection

22 of listening to the recordings.

23    Q.  Okay.  And Dana has included notes here, 1427

24 through 1433.  There's no information in your policies and

25 procedures to explain why a collector is making a

1  determination about the nature of this debt and its

2  dischargeability is there?

3      A.  Now, that's -- point of clarification -- it was

4  Danielle and she's not a collector.

5      Q.  Who is she then?

6      A.  She's our garnishment clerk.

7      Q.  Okay.  So is she well versed in bankruptcy?

8      A.  I believe so.

9      Q.  Has she been trained in it?

10     A.  Yes.

11     Q.  And did you talk to her prior to today's testimony

12 about why she put these notes in the file?

13     A.  No.

14     Q.  Do you have any reason to know why she would have

15 put the notes in the file here at 1427 that say that this

16 debt was not discharged under her husband's bankruptcy?

17     A.  It would be an assumption.  I don't know for sure.

18     Q.  But was she trained to say that?

19     A.  What do you mean?

20     Q.  Well, I can have you read them into the record.  Why

21 don't you start at 1427.

22     A.  I can clarify, if you'd like.

23     Q.  Sure.

24     A.  My assumption is she was basing her information on a

25 previous pack of notes that occurred in 2012 for this

Page 76

1   specific case.

2        Q.   And how do you know that?

3        A.   Generally when we're handling the file, we read the

4   notes in the packet.

5        Q.   And do your collectors generally assume that the law

6   is the same several years later?  Is that the policy at

7   Merchants Credit?

8        A.   She's the garnishment clerk.

9        Q.   How is she trained?  Does she have regular training

10  concerning these matters?

11       A.   I believe she does.

12       Q.   Well, do you know if she does?

13       A.   I don't do the training.

14       Q.   Who does the training?

15       A.   Dana is her supervisor and then she works closer

16  with our attorney as well.

17       Q.   And how often are your clerks trained?

18       A.   I'm not certain.

19       Q.   Yearly?

20       A.   They have weekly meetings.

21       Q.   So weekly meetings.

22       A.   Um-hmm.

23       Q.   So the training that you're talking about involves

24  weekly meetings or what?  How does it work?

25       A.   I don't know if I was talking about the training.  I

1  was answering your questions.  They do have weekly meetings.

2  I'm not certain exactly what the training is for them.

3      Q.  Okay.  But you're taking the position that they're

4  well trained on a regular basis?

5      A.  I believe they are.

6      Q.  So Jason has a note here on 1439 on page 39.  It

7  says, "Per Jason cannot speak to defendant as she has an

8  attorney representative." and what attorney are they

9  responding to there?

10     A.  Per Jason -- the note reads, "Per Jason, cannot

11  speak to" -- it should be consumer or debtor -- "as she has

12  attorney representation."  I believe that -- I don't know

13  for sure.  But I believe that she's referring to the letter

14  that we received.

15     Q.  And that letter is the last exhibit, Exhibit 18?

16     A.  Yes.

17     Q.  And that fax included a letter from 2012; is that

18  right?

19     A.  I believe so.

20     Q.  Okay.  So at some point on May 5th you reviewed the

21  letter, right?

22     A.  May 5th?

23     Q.  May 3rd.

24     A.  Yes.

25     Q.  And do you recall your conversation with Jason

Page 78

1    concerning this matter?

2        A.  I don't believe I talked to him.  My notes indicate

3    that I received a letter and we forwarded it to him through

4    our clerk at line 1500.

5        Q.  Okay.

6        A.  "Asked Pearla" -- she's our clerk -- "to review the

7    communication with Jason" and then my initials.

8        Q.  Okay.  And then what was determined that -- or what

9    did Merchants believe they should do after this letter was

10   reviewed by an attorney?

11       A.  Based on my recollection or the notes?

12       Q.  Both.

13       A.  I don't believe I looked at it again until just

14   recently.  And so I don't know exactly what happened other

15   than our notes.  I can review those right now and then

16   answer if you'd like.

17       Q.  Well, I'm curious because you stated earlier that

18   this was highly unusual.  Why is it that you don't remember?

19       A.  I don't know if I used the word "highly unusual" and

20   I can't remember exactly how I responded.  But it's not --

21   May was a long time ago.

22       Q.  Um-hmm.

23       A.  And it's not something that I have full recall over.

24       Q.  Okay.

25       A.  Therefore, I have to use the notes to refresh my

Page 79

1   memory.

2        Q.   In any case, at some point the debtor kept calling

3   in, correct?

4        A.   That appears to be the case, yes.

5        Q.   And did Merchants Credit ever release that

6   garnishment?

7        A.   I don't believe we did.

8        Q.   Okay.  And now I'm going to let you look at the

9   notes a bit more closely --

10       A.   Thank you.

11       Q.   --- and tell me at what point you had a full

12   determination from your attorney about what to do.

13       A.   I can recall that without the notes.

14       Q.   Okay.

15       A.   We received your letter.

16       Q.   All right.  So if we're going to talk about that,

17   I'll put that into evidence.

18            (Exhibits 19 and 20 marked.)

19       Q.   Okay.  So I have in front of you 19 and 20.  Exhibit

20   19 is a fax from Shirley Dickerson and 20 is a letter from

21   myself.  So in addition to the previous letter that we

22   looked at, you received these two additional letters,

23   correct?

24       A.   I believe so.

25       Q.   So before we go into what happened when you received

1    my letter, Exhibit 20, what happened when you received the

2    fax from Ms. Dickerson on Exhibit 19?  Was that also

3    forwarded to Jason Woehler?

4         A.  (Witness reviews document.)  Was the question, when

5    did we receive the fax?

6         Q.  Was that fax also given to Jason Woehler?

7         A.  I don't see where it was in the notes.

8         Q.  Have you reviewed that fax?

9         A.  Not in -- not unless it was part of the document

10   that was sent to you.

11        Q.  It was part of the documentation sent to me.

12        A.  Then I would have looked at it.

13        Q.  But it wasn't separately given to you by a

14   collector?

15        A.  No.

16        Q.  Okay.  What is in that information if you're looking

17   at it now?

18        A.  In this?  In my notes?

19        Q.  No.  Actually Exhibit 19.

20        A.  This is a fax cover sheet to David Fagan at

21   Merchants Credit Association, and it's a written letter to

22   Mr. Fagan, and it appears to be a copy of a bill, and a copy

23   of an assignment and itemized statement, and a schedule F,

24   creditor's holding and secured non-priority claims.

25        Q.  So those are in fact the details from the judgment

Page 81

1    entered against the Dickersons and the actual page from Mr.

2    Dickerson's 2012 bankruptcy, isn't it?

3         A.   It appears as if it may be.

4         Q.   Okay.  So if you didn't review it personally, can

5    you find in the notes where Mr. Fagan did?

6         A.   No.

7         Q.   So there was no notation taken at all?

8         A.   With regards to Fagan.

9         Q.   With regard to review of those documents.

10        A.   Line 1604 it says, "Fax forward to legal department"

11   and that was by "BLL" -- I'm not certain who that is.  It

12   may be Bea in our office -- BEA -- and fax was given to

13   Danielle Arrasmith to review.  Danielle is our garnishment

14   clerk.

15        Q.   Okay.  But it wasn't forwarded to your attorney?

16        A.   The notes -- I can't see that in the notes.

17        Q.   Okay.  Is there a reason why it wouldn't be

18   forwarded to Mr. Woehler?

19        A.   I would have to make an assumption.  I don't know.

20        Q.   Okay.  So we're still, by this point on May 15, with

21   no review from Mr. Woehler on either one of the two

22   communications from the debtor, correct?

23        A.   I don't know.

24        Q.   Well, you can take your time to look at the notes --

25   unless there's something else, besides the notes, that would

Page 82

1    tell you.

2        A.  He may have reviewed it but not entered a note.

3        Q.  Is there a reason that that would happen?  Does he

4    often do things without noting the file?

5        A.  Yes.

6        Q.  Okay.  So then was there communication in an email

7    or some other source?

8        A.  I don't know.

9        Q.  So in any case, if we go to Exhibit Number 20, this

10   is a letter from my office that was delivered to Merchants

11   Credit, correct?

12       A.  That appears to be the case, yes.

13       Q.  And did you review this letter in preparation for

14   today's testimony?

15       A.  Yes.

16       Q.  Okay.  And then I'm going to have you go back to

17   your testimony.  Did Mr. Woehler review this letter?

18       A.  This letter was given to him to review.

19       Q.  Okay.  And was there any notation in the file about

20   what to do based on this letter?

21       A.  No.

22       Q.  Let's go back to your testimony from before.  I'll

23   try to ask a similar question.  I'm not sure I'll get it

24   exactly the same at this point.  But at what point did you

25   get direction from Mr. Woehler about what to do on this

Case 12-11284-MLB   Doc 35-1   Filed 09/24/18   Ent. 09/24/18 20:27:48   Pg. 83 of 100

Page 83

1    file?

2        A.  I have a recollection of it.

3        Q.  Okay.

4        A.  I walked out of a meeting and somebody said,

5    "Christina Henry is on the phone and wants to talk to Jason.

6    What should I do?  Jason is not here."  And at that point in

7    time I looked at the file and read everything in the notes.

8    And I believe I talked to Jason that day, or soon

9    thereafter, about this.

10       Q.  Do you remember when that was?

11       A.  It would have been after July the 26th.

12       Q.  Okay.  So it definitely wasn't at the time that you

13   got the letter in June of 2018?

14       A.  I have no recall of looking at this file between

15   that time and the time when you called our office.

16       Q.  Okay.  So what was done when this letter was

17   received by your office?

18       A.  I would have to read the notes to determine that.

19       Q.  Please do.

20       A.  What's the date on that letter again?  June the 8th?

21       Q.  Yeah.

22       A.  On note line 1678 it says, "Received letter from

23   debtor's attorney to Jennifer Hathaway to review with

24   Jason."  "Letter from Attorney Christina Henry re Banko to

25   Jason Woehler to review."  A "copy of the letter, scanned to

Page 84

1    our packet."  And those are all of the notes I have with

2    regards to any type of action on your letter --

3        Q.   So did Jason Woehler ever review the letter?

4        A.   -- has he reviewed the letter?

5        Q.   Did he review it at the time?

6        A.   The notes -- I can't tell from our notes if he did

7    or not.

8        Q.   Is he accessible?

9        A.   Yes.

10        Q.   Is it common for him to review things under a short

11    period of time?

12        A.   It depends.

13        Q.   So what would it depend on?

14        A.   That's not a question I can really answer.  I don't

15    know.  Sometimes he reviews things right away and sometimes

16    it takes him a few days to do it.

17        Q.   Would he be knowledgeable about bankruptcy issues?

18        A.   I believe he is.

19        Q.   And he's done this for a long time, right?

20        A.   I have or he has?

21        Q.   He has.

22        A.   I believe he has, yes.

23        Q.   How long has he been in your office?

24        A.   I don't know for certain, but would guess maybe

25    three or four years.

Page 85

1      Q.  Okay.

2      A.  In our office.

3      Q.  Right.  And Merchants Credit depends on him for most

4  of their legal advice, correct?

5      A.  Correct.

6      Q.  And would you say, in this case, that you depended

7  on Mr. Woehler's advice in order to take the actions that

8  Merchants Credit took?

9      A.  It depends on what time frame you're talking about.

10     Q.  What time frame would I be talking about?

11     A.  We have been taking action on this case all the way

12  back to the time, you know, from the bill was listed with

13  our office until now.  So it's been the better part of a

14  decade, and he hasn't worked for us that long.

15     Q.  Well, let's focus our discussion since the time that

16  you started garnishing in April of 2014 forward.  He

17  certainly was at your office then, right?

18     A.  Yeah.  What's your question?

19         (Reporter read back as requested.)

20     A.  I think that's fair, since we received the letter

21  from the consumer in early May -- whenever that day was --

22  and phone calls with her.  I believe that's a fair

23  statement.

24     Q.  Okay.  And I'll refer you to one note in the system

25  here -- strike that.

1          Merchants Credit is a member of credit associations,

2     correct?

3          A.  Yes.

4          Q.  I believe it's referred to as ACA.  Could you tell

5     me what that acronym stands for?

6          A.  That's America Collectors International.

7          Q.  Okay.  And it's not unusual for you to refer to the

8     advice of an attorney in an unusual collection matter,

9     correct?

10         A.  That's correct.

11         Q.  And so in this case was it possible for your

12    collectors to know how to deal with this debt without

13    assistance from Jason?

14         A.  Then or in retrospect?

15         Q.  Since April 2018 when you started collecting again

16    and after the client kept calling and sending in faxes?

17         A.  Well, it just depends.

18         Q.  In this particular situation?

19         A.  Typically, if we've received a letter like this and

20    there's notes where it's been forwarded to Jason, there

21    should be conversations with Jason before additional action

22    is taken.  And I'm not certain if that's happened or not

23    because sometimes he doesn't note the file.

24         Q.  Okay.  In any case, this letter from myself in

25    Exhibit Number 20 was reviewed and nothing was done, right?

Page 87

1       A.  I'm not certain.

2       Q.  Well, have you talked to the collectors about what

3   was done?

4       A.  I don't -- when?

5       Q.  When you became aware of this -- the issues in the

6   file.

7       A.  So I became aware after you called our office -- of

8   that letter -- so I was unaware of that letter between the

9   time we received it and the time you called in, so I don't

10  understand your question.  Are you asking -- can you give me

11  a time frame?

12      Q.  Well, this letter was sent June 8th, right?

13      A.  Um-hmm.

14      Q.  And you testified that I may have called your office

15  at some point after July 26th, right?

16      A.  That's correct, yeah.

17      Q.  So that's a month and a half.  Correct?

18      A.  Correct.

19      Q.  So there was no activity, based on this letter, in

20  your office for a month and a half, correct?

21      A.  I want to make sure I'm accurate for you based on

22  the notes.  We received the letter from you on June the

23  11th.  It was given to Jason to review on the same day.

24  They're -- no collector looked at the file between that time

25  and the end of the notes on July the 26th.

1        Q.  So Jason was told to review this on June 11th.  And

2    did he review it?

3        A.  I don't know.  I think you've asked me that.  I

4    don't know if he did or not.  There's no notes to reflect

5    whether or not he did.  But oftentimes he won't note the

6    file on things that he reviews.

7        Q.  But you can agree the collection didn't stop, right?

8        A.  I can agree with that.

9        Q.  You can agree garnishment wasn't released, correct?

10       A.  Let me clarify.  I can agree that action that had

11   been taken prior to the receipt of your letter did not stop.

12   There doesn't appear to be any additional action that I can

13   see, collection action.

14       Q.  Okay.  And at some point you say that the first time

15   you became aware of things was a call from me to your

16   office.  Were you aware of a motion for sanctions being

17   filed against Merchants Credit?

18       A.  I don't believe I was.

19       Q.  Really?  So that doesn't rise to your level?

20       A.  No, it does.  When was the motion for sanctions

21   served on us?

22       Q.  I can tell you that it was filed the 26th, and I

23   believe it was served the same day.

24       A.  When did you call our office?

25       Q.  It would have been after that date?

Page 89

1        A.   So I think I probably was made aware, you know,

2   within a couple of days.  But it is not reflected here in

3   the notes.

4        Q.   Okay.  Is there a reason why these notes are cut off

5   on the 26th?

6        A.   I don't know.  I didn't provide them -- I don't know

7   why that is other than maybe -- I would have to guess.

8        Q.   Okay.  So we can acknowledge that there's been a

9   motion for sanctions filed against Merchants Credit sometime

10  at the end of July, correct?

11       A.   I think so.

12       Q.   Okay.  And Merchants still hasn't released the

13  garnishment, correct?

14       A.   I did ask about that today, and I don't believe we

15  have.  The funds have not been ordered.

16       Q.   And no action has been taken to change any policies

17  and procedures in your office; is that right?

18       A.   I don't think that's a fair statement.

19       Q.   Well, what is a fair statement?

20       A.   Can I have a conference with the attorney before I

21  answer that question?  I want to make sure I give an

22  appropriate answer.

23       Q.   I don't think so at this point.

24            MR. DICKMEYER:  If you understand the question,

25  answer as best you can.

1      A.   When I found out this was happening, I asked people.

2   I said, "Why can't we garnish somebody on a debt that was

3   incurred before the marriage if -- why can't we do that?"  I

4   had always thought we could on a job but we could not attach

5   a bank because the funds might be commingled.  But I thought

6   we were within our right, as did everybody that looked at

7   this file, to garnish somebody's job on a debt that was

8   incurred before the community was established, the marital

9   community.  And I asked about that and consulted with

10  attorneys, and we have found out that maybe there's an issue

11  with that.  I still don't understand it clearly because it

12  happened all of a sudden, and we're in the process of

13  changing that procedure.

14     Q.   Okay.  So when you say, "you asked people," who did

15  you ask?

16     A.   I asked our garnishment clerk.

17     Q.   So a clerk?

18     A.   Yeah.

19     Q.   Go ahead.

20     A.   I asked our garnishment clerk; I asked the clerk

21  supervisor; I asked my boss, Mr. Quigley; I asked Jason, our

22  attorney; I asked Carol Taylor.  I asked them all.

23     Q.   Okay.  And they were all under the impression that

24  the way things have been handled on this account was proper,

25  correct?

1      A.  Yes.

2      Q.  Okay.  Thank you.

3      A.  You're welcome.

4      Q.  That was a straightforward answer.  I appreciate it.

5  When you say you're "in the process of reviewing things,"

6  what does that process entail?

7      A.  I don't know exactly.  I would imagine in this

8  case -- I don't know.  I can't answer that in a

9  straightforward manner.

10     Q.  Okay.  And when you say "there's a process," you

11  haven't referred to any policy or procedure that would be

12  analogous to the situation here, have you?

13     A.  I don't believe so, if I understand your question

14  properly.

15     Q.  So then when you talk about collecting on community

16  property or a co-debtor debt after a bankruptcy, this is

17  just collective knowledge among supervisors and garnishment

18  clerks; is that correct?

19     A.  I think partially that's correct.  We have a lot of

20  people that have worked for our company for a number of

21  years a long, long time.  And many of these things are very

22  routine in nature.  And so I think -- I think your question

23  -- if I understand it right -- I think that's the best way I

24  can answer it.

25     Q.  Okay.  Well, we're just about done here at this

Page 92

1    point.  So we've talked previously at the lunch break about

2    getting some additional information for the breakdown of the

3    legal balance and the legal board to be provided, and I

4    understand that there's some delay on that.  So maybe we

5    could talk about whether or not that's something we can get

6    now and then maybe come back to it.  Or is that something we

7    need to continue the deposition for?

8            MR. DICKMEYER:  I can try and make a phone call and

9    see.  But my sense -- I get the sense that we're probably

10   going to have to continue the deposition because there just

11   may be some nuanced lengthy and nuanced explanations and

12   discussion between myself and the Merchants personnel.

13           MS. HENRY:  So let's break for a few minutes.  And

14   then if we can get it resolved -- I think it would make some

15   sense.  And if it doesn't, we'll come back on the record to

16   deal with it being continued.

17           (Brief recess.)

18           MS. HENRY:  We're back on the record to ask a

19   limited number of questions concerning the legal fees and

20   costs.

21      Q.  So, Mr. Wiswall, you've had a chance to review your

22   notes and talk with the back office concerning legal fees

23   and costs that you testified about earlier on page 5 of the

24   collection notes, which is in Exhibit 6; is that right?

25      A.  Correct.

Page 93

1     Q.  So I'm going to have you look at lines 2 and 3 in

2  the middle of the page of the payment dispersements.  And I

3  understand that you have some little more information as to

4  what those amounts and fees went to pay?

5     A.  I do.

6     Q.  Why don't you walk me through each one of them and

7  tell me what we're dealing with.

8     A.  On page 7, the information is actually there.  And

9  if we look at the $296.16, Item Number 2 on page 5, that is

10  broken down by Items Number 2, 3, and 4 on page 7.  $32 was

11  posted to code 70, which is filing fees.  $19.39 was posted

12  to a code 71, which is process service paid -- process

13  service fees, $19.39.  And then code 73 on August the 6th,

14  2010, $244.77 was posted to attorney fees.  On note line or

15  sequence Number 5 --

16     Q.  Let me stop you there for a minute.  So attorney's

17  fees, as I recall from the judgment, were statutory for only

18  $200, so why would it be $244.77?

19     A.  As I understand it on this bucket for code 73, the

20  attorney fees would be for summons and garnishment fees or

21  attorney fees related to the garnishment.

22     Q.  Okay.

23     A.  So on sequence Number 5 on January the 14th, 2011,

24  we have a code 70, $125 was applied; and the code 70 is

25  filing fees.  Same date, code 71, $67.19 was posted on

Page 94

1   January the 14th of 2011, process service fee bucket.

2        Q.   Um-hmm.

3        A.   Code 73, same date, $455.23, attorney fee was

4   posted.  And then code 74, $396, judgment interest was

5   posted.

6        Q.   Okay.  And then the attorney's fees there on line 7,

7   is that for a garnishment of attorney's fees?

8        A.   I'm not certain of that.

9        Q.   Do you know how you can find out?

10       A.   Yes, from our back office.

11       Q.   But for today's purposes, it's more attorney's fees

12   related to garnishments and/or the original complaint?

13       A.   I believe so.

14       Q.   We talked about getting some other information that

15   you were trying to get to your office.  And it's my

16   understanding you won't be able to have that today; is that

17   right?

18       A.   I have some of the information but not all of it.  I

19   don't know what type of conversation you may have had off

20   the record with our attorney.

21       Q.   Well, to put on the record, it's my understanding

22   with your attorney that we're going to close the deposition

23   for today but there may be some additional items concerning

24   the balance due at the time of the regarnishing in April

25   2018 that may be followed up with written discovery.

Case 12-11284-MLB   Doc 35-1   Filed 09/24/18   Ent. 09/24/18 20:27:48   Pg. 95 of 100

Page 95

1       A.  I think that's accurate, yes.

2           MS. HENRY:  Is that accurate?

3           MR. DICKMEYER:  Right, I think that's accurate.

4                           EXAMINATION

5   BY MR. DICKMEYER:

6       Q.  Mr. Wiswall, Ms. Henry asked you about naming John

7   Doe Dickerson as the husband in the lawsuit.  At the time

8   the lawsuit -- and you can refer to Exhibit 6 for purposes

9   of your answer -- at the time Merchants filed suit against

10  Mrs. Dickerson and John Doe, did you know the identity of

11  her husband?

12      A.  No.

13      Q.  Do you know whether or not at any time after

14  Merchants filed suit against Mrs. Dickerson, that Merchants

15  amended the pleadings to reflect the correct actual name of

16  her husband?

17      A.  I don't know.

18      Q.  Take a look at Exhibit 6 and turn to page 32,

19  beginning at line 1042.  Ms. Henry asked you some questions

20  about the entry that runs from line 1042 to 1050 -- excuse

21  me -- 1051.  What does that entry tell you as far as what

22  information may have been given to Merchants by Ms.

23  Dickerson's attorney at that time?

24      A.  That entry tells me that we had a communication with

25  an attorney who agreed or told us that if we went ahead and

Page 96

1    released everything with regards to garnishment, that it

2    would be okay to initiate collection again on the bill that

3    was incurred prior to the marriage.

4        Q.  Okay.  And these notes reflect -- these notes are a

5    contemporaneous entry by Merchants' personnel of contact

6    they had with respect to this account, correct?

7        A.  Yes.

8        Q.  And are these notes relied on Merchants' personnel

9    as they collect and manage the collection of accounts?

10       A.  Yes.

11       Q.  And is it a customary practice of Merchants'

12   personnel to make a contemporaneous entry into the notes --

13   in what you call the hard copy -- of contact they have with

14   counsel for debtors?

15       A.  Yes.

16       Q.  And to the best of your knowledge, does Exhibit 6,

17   in its entirety, represent a business record of Merchants'

18   that's maintained in the ordinary course of business?

19       A.  Yes.

20       Q.  I don't have any other questions.

21           MS. HENRY:  That's it.

22           (Concluded at 2:52 p.m.)

23           (Signature reserved.)

24           (Exhibits 17-A to 17-C marked.)

25

Page 97

1              S I G N A T U R E

2

3            I declare under penalty of perjury under

4     the laws of the State of Washington that I have read my

5     within deposition, and the same is true and accurate,

6     same and except for changes and/or corrections, if any,

7     as indicated by me on the CHANGE SHEET flyleaf page

8     hereof.  Signed in..............., WA, on the........day

9     of..............., 2018.

10

11

12

13                                  ...........................

14                                  30(b)(6) Merchants Credit

15                                  Corporation

16                                  Designee:  Scott Wiswall

17                                  Taken:  August 28, 2018

18

19

20

21

22

23     Re:  Demetrius Bertrand Dickerson Sr., Debtor

24     Cause No.  12-11284

25     Christina L. Atencio, CCR

Page 98

 1                 C E R T I F I C A T E

 2

    STATE OF WASHINGTON    )
 3                         )ss
    COUNTY OF SNOHOMISH     )

 4

 5          I, the undersigned Washington Certified Court
    Reporter, hereby certify that the foregoing 30(b)(6)
 6  deposition upon oral examination of MERCHANTS CREDIT
    CORPORATION, DESIGNEE:  SCOTT WISWALL was taken
 7  stenographically before me on August 28, 2018 and
    transcribed under my direction;

 8

          That the witness was duly sworn by me pursuant to
 9  RCW 5.28.010 to testify truthfully; that the transcript of
    the deposition is a full, true, and correct transcript to
10  the best of my ability; that I am neither attorney for nor a
    relative or employee of any of the parties to the action or
11  any attorney or counsel employed by the parties hereto nor
    financially interested in its outcome.

12

          I further certify that in accordance with CR 30(e),
13  the witness was given the opportunity to examine, read and
    sign the deposition, within 30 days, upon its completion and
14  submission, unless waiver of signature was indicated in the
    record.

15

          IN WITNESS WHEREOF, I have hereunto set my hand this
16  6th day of September, 2018.

17

18

19  \S\CHRISTINA ATENCIO

20  _____
    Washington Certified Court Reporter No. 2749
21  License expires November 6, 2018

22

23

24

25

Page 99

```
 1              SEATTLE DEPOSITION REPORTERS
             600 UNIVERSITY STREET, SUITE 320
 2                  SEATTLE, WA  98101
                    (206) 622-6661
 3
                 C H A N G E   S H E E T
 4
      PLEASE MAKE ALL CHANGES OR CORRECTIONS ON THIS SHEET,
 5    SHOWING PAGE, LINE AND REASON.
      -------------------------------------------------------
 6    PAGE  LINE     CORRECTION AND REASON

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22              _____
                30(b)(6) Merchants Credit
23              Corporation
                Designee:  Scott Wiswall
24              Taken:  August 28, 2018
      Re:  Demetrius Bertrand Dickerson, Sr., Debtor
25    Cause No. 12-11284
```